STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT, v. STUART BURSTEIN, DEFENDANT-APPELLANT AND CROSS-RESPONDENT.

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT, v. MATTHEW GREENHAUSE, DEFENDANT-APPELLANT AND CROSS-RESPONDENT.

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT, v. NICHOLAS BARRISE, DEFENDANTAPPELLANT, AND STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT, v. CONCETTA DEHART, DEFENDANT-APPELLANT.

Argued December 2, 1980—Decided March 16, 1981.

396

*Harvey Weissbard* argued the cause for appellant Greenhause (*Isles, Newman & Weissbard*, attorneys).

*Gregory J. Aprile* argued the cause for appellant Burstein (*Philip M. Saginario*, attorney).

*Barry G. Evertz* argued the cause for appellants Barrise and DeHart.

*Gage Andretta*, Assistant Essex County Prosecutor, argued the cause for respondent and cross-appellant (*John J. Degnan*, Attorney General of New Jersey, attorney; *Donald S. Coburn*, Essex County Prosecutor, of counsel; *Gage Andretta, Miriam Kahan Brody*, Assistant Essex County Prosecutor, and *Marc J. Friedman*, Deputy Attorney General, on the briefs).

The opinion of the Court was delivered by

WILENTZ, C. J.

These cases present several questions relating to New Jersey's Wiretapping and Electronic Surveillance Control Act ("Wiretap Act"), *N.J.S.A.* 2A:156A–1 *et seq.*

The sealing provision of the Act, *N.J.S.A.* 2A:156A–14, requires tapes of all intercepted conversations to be presented "immediately" to an appropriate judge for sealing. In *State v. Cerbo*, 78 *N.J.* 595 (1979), we held that a delay in presenting the

tapes for sealing would result in suppression of the tapes unless there was a satisfactory explanation for the delay. This case presents the question of whether *Cerbo* should be applied retroactively to suppress tapes whose late sealing occurred prior to February 2, 1979, the date of that decision.

We are presented with two additional questions: first, when tapes are suppressed because of a sealing delay, whether derivative evidence from those tapes is nevertheless admissible at trial; and second, whether the State complied with its obligation to minimize both its hours of interception and its interception of non-relevant calls within the hours of interception.

For the reasons set forth in this opinion, we hold that *Cerbo* is not to be applied retroactively, even to cases that have not yet exhausted all direct avenues of appeal. We further note that, when tapes are suppressed because of a sealing violation, evidence derived from other wiretaps or search warrants based on those tapes is nevertheless admissible at trial where the derivative wiretap or search warrant was authorized prior to the sealing violation. Finally, we hold that the State fully complied with all of its minimization obligations in the instant wiretap.

## I.

## FACTS

These cases involve appeals from two Appellate Division decisions, *State v. Burstein*, 172 *N.J.Super.* 388 (1980), and *State v. Barrise*, 173 *N.J.Super.* 549 (1980), which disagreed on the question of whether *Cerbo* should be applied retroactively. The facts of each case will be discussed separately.

A. *Facts—State v. Burstein*

On October 25, 1978, Stuart Burstein and Matthew Greenhause pled guilty to conspiracy to violate the narcotics laws and possession of marijuana with intent to distribute.

The case against them had been based largely on evidence derived from a series of wiretaps conducted by the Essex County Prosecutor's Office between December 2, 1977, and

January 5, 1978. The tapes from those wiretaps are the subject of this appeal.

On December 2, 1977, the Prosecutor's Office applied for an order authorizing a wiretap of the phone of Matthew Greenhause. The application was made to Assignment Judge Arthur J. Blake of the Superior Court, Law Division, who had been designated by Chief Justice Hughes, pursuant to *N.J.S.A.* 2A:156A–2(i), to authorize such applications. The wiretap was sought as part of an ongoing investigation of a major Essex County narcotics network in which Greenhause was believed to play a major part. Judge Blake granted the order, authorizing 24-hour surveillance for a period of 20 days. Such round-the-clock surveillance was based on a showing by the Prosecutor's Office that there was a "special need" for it, due to "the magnitude of the operation" and the observation of several of the State's affiants that, based on their experience, "this type of narcotics dealer converses with his associates at any time of day or night."

The police continued to tap Greenhause's phone throughout the month of December, receiving one extension. On December 28, 1977, the State applied to Judge Blake for authorization to intercept conversations over the telephone of Stuart Burstein. Probable cause for the Burstein wiretap was derived largely from information gathered during the Greenhause wiretap.

The Greenhause wiretap was terminated on December 31, 1977, and the Burstein wiretap on January 5, 1978. On that day both men's residences were searched pursuant to court-authorized search warrants, and narcotics were seized in both places. The affidavits in support of both search warrants included numerous conversations intercepted during the wiretaps.

The tapes of the Burstein wiretap were sealed six days after its termination. The tapes of the Greenhause wiretap, however, were not presented to Judge Blake for sealing until January 30, 1978, a delay of 30 days. The reason given by the State for its delay in presenting the tapes for sealing was that the Attorney General had changed the format for drawing up notices of

inventory, a procedure by which the judge is given a list of all parties whose conversations were intercepted so that appropriate notification can be given.[1] This change in format had made it necessary to redo all of the original notices of inventory, which were still unfinished as of January 30, 1978. By that time, however, the State had become sufficiently concerned about the delay to present the tapes for sealing without notices of inventory.

At a pretrial hearing. on October 25, 1978, the defendants moved to suppress both the tapes of the wiretap and the evidence derived as fruits of the wiretap. Both motions were denied, and the defendants pled guilty, reserving their right to raise the suppression issues on appeal.

While the appeal was pending, we announced our decision in *State v. Cerbo*, 78 *N.J.* 595 (1979). The defendants then argued before the Appellate Division that *Cerbo* should be applied retroactively to suppress the Greenhause tapes. They further argued, among other things, that the Burstein tapes and all other evidence derived from the Greenhause wiretap should be suppressed as well and that the State had failed to make reasonable efforts to minimize its interception of non-pertinent conversations during the Greenhause wiretap.

The Appellate Division agreed that the Greenhause tapes should be suppressed, but declined to suppress the Burstein tapes or other evidence derived from the Greenhause wiretap. *State v. Burstein*, 172 *N.J.Super.* 388 (1980). The court, concluding that there was no satisfactory explanation for the sealing delay, suppressed the Greenhause tapes, not as a matter of

---

[1] *N.J.S.A.* 2A:156A–16 requires that notices of inventory be served on persons named in the order or application, persons arrested as a result of interception of their conversations, persons who are either indicted or likely to be indicted because of interception of their conversations, or persons whose conversations were intercepted and are likely to be called as witnesses. Uninvolved parties whose conversations are intercepted need be notified only if the judge in his discretion determines such notification to be in the interests of justice.

retroactivity, but because both the sealing requirement and a suppression sanction had been plainly spelled out in *N.J.S.A.* 2A:156A–14 since 1968, well before the events in this case. The court concluded that there was no retroactivity question involved, and remanded the case for the purpose of giving the defendants an opportunity to reconsider their guilty pleas.

B. *Facts—State v. Barrise*

On July 16, 1974, Judge Blake authorized a 21-day wiretap of a telephone listed to D. Glovan, Newark, New Jersey. The wiretap was sought as part of a joint investigation by a City of Newark—Essex County Strike Force into a suspected lottery operation being run on those premises.

The wiretap ran until August 1, 1974. On that date search warrants were issued for five different locations, and a "sweep" was executed. Several suspects were arrested, including defendants Nicholas Barrise and Concetta DeHart.

On August 6, 1974, the tapes were ready to be presented to Judge Blake for sealing. However, the judge was away on vacation for the month. The State did not present the tapes to another judge for sealing because the statute had unequivocally directed that the tapes "shall be transferred *to the judge issuing the order* and sealed under his direction." *N.J.S.A.* 2A:156A–14 (emphasis added). Thus the tapes remained in a sealed package inside a vault in the Prosecutor's Office rather than being presented for sealing. Nor were the tapes presented for sealing during the first week of September, at which time Judge Blake was attending the annual State Judicial College. The tapes were finally presented to Judge Blake for sealing on September 10, a delay of 40 days.

The tapes were used against both Barrise and DeHart at trial and on January 23, 1978, both defendants were found guilty of conspiracy to violate the State gambling laws.

Barrise and DeHart appealed their convictions on several grounds, including the State's failure to comply with the sealing requirement. The Appellate Division agreed that the sealing

delay had violated *N.J.S.A.* 2A:156A–14, but refused to apply *Cerbo* retroactively and suppress the tapes. *State v. Barrise,* 173 *N.J.Super.* 549 (1980). Although it rejected the State's justification for the sealing delay (concluding that Judge Blake was available despite his vacation),[2] the court declined to suppress the tapes. It concluded that the deterrent purposes of *Cerbo* would not be furthered by retroactive application, that the State had justifiably relied on previous law to the contrary, and that retroactive application would have an adverse impact on the administration of justice. 173 *N.J.Super.* at 555–57. We agree with its conclusion.

With *Barrise* in direct conflict with the previous Appellate Division decision in *State v. Burstein, supra,* 172 *N.J.Super.* 388, we granted certification to resolve the dispute as to whether *Cerbo* should be applied retroactively, as well as to resolve the other questions discussed in this opinion.[3]

## II.

### RETROACTIVITY

■ As a preliminary matter, we note that this Court has four options open to it in any decision involving retroactivity: (1)

---

[2] The Appellate Division concluded that it could not fault the State for failing to seek out another authorized judge in light of the statutory language on which the State relied. However, it held that the statute should henceforth be construed so as to allow the tapes to be sealed by any authorized judge when the judge who issued the order is unavailable. 173 *N.J.Super.* at 551. We adopt this reasoning, because any other interpretation of the statutory language would render the sealing provision unworkable.

[3] All of the appellants raised additional points not discussed here. Burstein and Greenhause have raised the questions of whether the omission of certain statutory minimization language from the wiretap order rendered the order defective, whether the State demonstrated sufficient need for 24-hour surveillance, and whether the wiretap orders were validly authorized. Barrise also raised the questions of whether there was sufficient evidence to connect him to the gambling conspiracy and whether the voice exemplar he was forced to give was sufficiently suggestive to violate due process. We have concluded these points to be without merit.

make the new rule of law purely prospective, applying it only to cases whose operative facts arise after the new rule is announced; (2) apply the new rule to future cases and to the parties in the case announcing the new rule, while applying the old rule to all other pending and past litigation; (3) grant the new rule limited retroactivity, applying it to cases in (1) and (2) as well as to pending cases where the parties have not yet exhausted all avenues of direct review; and, finally, (4) give the new rule complete retroactive effect, applying it to all cases, even those where final judgments have been entered and all avenues of direct review exhausted. *State v. Nash*, 64 *N.J.* 464, 468–70 (1974).

The threshold question in any retroactivity decision is whether a new rule of law has actually been announced. As the very term implies, retroactivity can arise only where there has been a departure from existing law. *See State v. Catania,* 85 *N.J.* 418 (1981), decided today (prior New Jersey minimization law did not impose a certain requirement); *State v. Carpentieri,* 82 *N.J.* 546 (1980) (prior New Jersey decisions had allowed random traffic stops); *State v. Czachor,* 82 *N.J.* 392 (1980) (judges had previously been allowed to give the *"Allen"* charge to the jury); *State v. Howery,* 80 *N.J.* 563, *cert.* den., 444 *U.S.* 994, 100 *S.Ct.* 527, 62 *L.Ed.2d* 424 (1979) (prior New Jersey decisions had barred inquiries into the veracity of statements contained in affidavits in support of a search warrant); *State v. Lueder,* 74 *N.J.* 62 (1977) (prior law had not required juvenile courts to afford juveniles counsel and a hearing before waiving jurisdiction over them in favor of an adult prosecution); *State v. Nash, supra,* 64 *N.J.* 464 (prior law had allowed greater sentences for defendants who appealed their municipal court convictions). In all of the foregoing retroactivity cases, the decision in question had changed prior law.

The defendants first contend that there is no question of retroactivity involved here. They argue that the result announced in *Cerbo* was not a new rule of law, but had been

mandated all along by the clear language of the sealing provision, *N.J.S.A.* 2A:156A–14, which provides:

Immediately upon the expiration of the order or extension or renewals thereof, the tapes, wires, or other recordings shall be transferred to the judge issuing the order and sealed under his direction . . . .

The sealing provision also contains a remedies section, which provides:

The presence of the seal provided by this section, or a satisfactory explanation for its absence, shall be a prerequisite for the disclosure of the contents of any wire or oral communication, or evidence derived therefrom, under subsection b of section 17 of this act [which refers to the giving of testimony at trial]. [*N.J. S.A.* 2A:156A–14].

The defendants argue that, because the sealing requirement and suppression sanction were unequivocally the law since 1968, *Cerbo* announced no new rule of law and the tapes should be suppressed pursuant to the plain language of the statute.

The State concedes that the statutory command to present the tapes for sealing "immediately" was unequivocal. However, the State argues that it was unclear from the remedies section of the statute whether suppression would automatically follow *all* sealing delays that were not accompanied by a "satisfactory explanation." This uncertainty grew out of an almost unbroken line of federal decisions which had interpreted the virtually identical federal sealing provision, 18 *U.S.C.* § 2518(8)(a), after which New Jersey's sealing requirement is modeled, as not requiring suppression provided the Government could show that the tapes had not been tampered with during the sealing delay. Their rationale was that the Congressional purpose underlying the sealing provision, maintaining the integrity of the tapes, was realized as long as the integrity of the tapes was not in question. Once a showing of such integrity was made, the sealing delay was deemed a technical violation which should not lead to suppression. Four Circuits had reached this conclusion. *E. g., United States v. Angelini*, 565 *F.*2d 469, 471–73 (7th Cir. 1977), *cert.* den., 435 *U.S.* 923, 98 *S.Ct.* 1487, 55 *L.Ed.*2d 517 (1978); *McMillan v. United States*, 558 *F.*2d 877, 878–79 (8th Cir. 1977); *United States v. Sklaroff*, 506 *F.*2d 837, 840 (5th Cir. 1975), *cert.*

den., 423 *U.S.* 874, 96 *S.Ct.* 142, 46 *L.Ed.2d* 105 (1976); *United States v. Falcone,* 505 *F.2d* 478, 484 (3d Cir. 1974), *cert.* den., 420 *U.S.* 955, 95 *S.Ct.* 1339, 43 *L.Ed.2d* 432 (1975). Only one Circuit, the Second Circuit, had held that suppression would automatically follow a sealing delay, and it did so under circumstances far more outrageous than those presented here. *United States v. Gigante,* 538 *F.2d* 502, 505–07 (2d Cir. 1976) (involving unexplained 8 to 12 month delays).

This considerable federal authority was reinforced by two Appellate Division decisions which held that a sealing delay would not result in suppression as long as the State could prove that the tapes had not been tampered with in the interim. *State v. Cerbo,* 152 *N.J.Super.* 30 (App.Div.1977), aff'd on other grounds, 78 *N.J.* 595 (1979); *State v. Gaffey,* No. 3176–74 (App.Div. Jan. 13, 1977).[4]

Finally, the Assignment Judges to whom tapes were delivered for sealing had regularly accepted the tapes even when presented late. This judicial acquiescence in sealing delays must surely have confirmed the State's belief that there was nothing inherently improper about these delays, as long as the integrity and accuracy of the tapes could be demonstrated.

Our review of the above developments convinces us that, by the time of the events in this case, the seemingly clear meaning of the remedies section of our sealing requirement had become so undone by subsequent case law that the State had good reason to believe that a sealing delay would not result in suppression where the integrity and accuracy of the tapes were unquestioned. *Cf. State v. Cerbo,* 78 *N.J.* at 606–07 (the law with respect to sealing was "inconsistent and uncertain").

---

[4]The precedential value of both opinions was limited. *Gaffey* was an unpublished opinion, and *Cerbo* contained a dissenting opinion which put the State on notice that *Cerbo* was entitled to automatic Supreme Court review, and that a pronouncement on the subject by this Court would soon be forthcoming.

■ Where the meaning of a statute as determined by prior decision is changed, the court decision changing it is the equivalent of a new rule of law, thus raising the issue of retroactivity. *Cf. Halliday v. United States*, 394 *U.S.* 831, 89 *S.Ct.* 1498, 23 *L.Ed.*2d 16, 19 (1969) (construing an amendment to Rule 11 of the Federal Rules of Criminal Practice); *Oxford Consumer Discount Co. v. Stefanelli*, 104 *N.J.Super.* 512, 521 (App.Div. 1969), aff'd, 55 *N.J.* 489, appeal dismissed, 400 *U.S.* 923, 91 *S.Ct.* 183, 27 *L.Ed.*2d 182 (1970) (construing the scope of the New Jersey Secondary Loan Act). We conclude that *Cerbo* amounted to a new rule of law. The question remains, therefore, whether that new rule should be applied retroactively to require the suppression of the tapes in this case.

■ In deciding whether to apply a new rule of law retroactively, three factors must be considered: (1) the purpose of the new rule and whether it would be furthered by retroactive application; (2) the reliance placed on the old rule by those charged with administering it; and (3) the effect that retroactive application would have on the administration of justice. *State v. Catania, supra,* 85 *N.J.* at 446; *State v. Carpentieri, supra,* 82 *N.J.* at 549; *State v. Howery, supra,* 80 *N.J.* at 569; *State v. Lueder, supra,* 74 *N.J.* at 77–78; *State v. Nash, supra,* 64 *N.J.* at 471.

The first factor, the purpose of the new rule, is often the pivotal consideration. In cases where the new rule is an exclusionary rule, meant solely to deter illegal police conduct, the new rule is virtually never given retroactive effect. The reason is that the deterrent purposes of such a rule would not be advanced by applying it to past misconduct. *See State v. Catania, supra,* 85 *N.J.* at 446–447; *State v. Carpentieri, supra,* 82 *N.J.* at 549; *State v. Howery, supra,* 80 *N.J.* at 569. At the other extreme are cases where the purpose of the new rule "is to overcome an aspect of the criminal trial that *substantially impairs* its truth-finding function" and which raises "serious questions about the accuracy of guilty verdicts in past

trials." *Williams v. United States,* 401 *U.S.* 646, 653, 91 *S.Ct.* 1148, 28 *L.Ed.*2d 388, 395 (1971). In such cases the new rule is given *complete* retroactive effect, regardless of how much the State justifiably relied on the old rule or how much the administration of justice is burdened. Because this is such a drastic result, it has usually been applied only to those cases where the old rule "substantially" impaired the reliability of the truth-finding process. Complete retroactivity has thus been given to the requirement that the State may not escape its burden of proof beyond a reasonable doubt by using presumptions to shift burdens of proof to the defense, *Hankerson v. North Carolina,* 432 *U.S.* 233, 97 *S.Ct.* 2339, 53 *L.Ed.*2d 306 (1977); the requirement that, in juvenile proceedings, the State prove beyond a reasonable doubt all elements of an offense that would constitute a crime if committed by an adult, *Ivan V. v. City of New York,* 407 *U.S.* 203, 92 *S.Ct.* 1951, 32 *L.Ed.*2d 659 (1972); the right to counsel at preliminary hearings in which a defendant must assert certain defenses or lose them, *Arsenault v. Massachusetts,* 393 *U.S.* 5, 89 *S.Ct.* 35, 21 *L.Ed.*2d 5 (1968); the rule barring the admission of one co-defendant's extrajudicial confession implicating another defendant, *Roberts v. Russell,* 392 *U.S.* 293, 88 *S.Ct.* 1921, 20 *L.Ed.*2d 1100 (1968); the right to counsel at trial, *Pickelsimer v. Wainwright,* 375 *U.S.* 2, 84 *S.Ct.* 80, 81, 11 *L.Ed.*2d 41 (1963); and the requirement that a confession made some time ago meet current standards of voluntariness, *Reck v. Pate,* 367 *U.S.* 433, 81 *S.Ct.* 1541, 6 *L.Ed.*2d 948 (1961).

In *State v. Czachor,* 82 *N.J.* 392 (1980), we invalidated the use in criminal cases of the "*Allen*" charge, in which a judge can bring pressure on the jury to reach a unanimous verdict. We held that our ruling was to have limited retroactive effect. Justice Handler, writing for the Court, distinguished *Czachor* from cases such as *Howery,* which dealt with the exclusionary rule, on the ground that "this case deals with the ultimate fairness and soundness of the jury's verdict." *Id.* at 408. Because the new rule affected the integrity of the truth-finding process, it was given limited retroactive effect. We declined to

make the new rule completely retroactive in the absence of more complete information as to the effect complete retroactivity would have on the administration of justice. *Id.* at 409–10.

In between these extremes is a third category of cases, where the new rule is designed to enhance the reliability of the factfinding process but the old rule did not "substantially" impair the accuracy of that process. In measuring the extent to which the old rule impaired the truth-finding process, two things should be considered: first, the likelihood of untrustworthy evidence being admitted under the old rule and, second, whether the defendant had alternate ways of contesting the integrity of the evidence being introduced against him. After this determination is made, the extent to which the old rule impaired the reliability of the truth-finding process is then balanced against the countervailing State reliance on the old rule and the disruptive effect that retroactivity would have on the administration of justice. Using this analysis, the United States Supreme Court has refused to grant retroactive effect to: the Sixth Amendment right to counsel during interrogation and the Fifth Amendment right to be given *Miranda* warnings, *Johnson v. New Jersey*, 384 *U.S.* 719, 729–30, 86 *S.Ct.* 1772, 1778–79, 16 *L.Ed.2d* 882, 890 (1966); the prohibition against commenting on a defendant's failure to testify at trial, on the ground that such comments did not present a "clear danger of convicting the innocent," *Tehan v. Shott*, 382 *U.S.* 406, 416, 86 *S.Ct.* 459, 465, 15 *L.Ed.2d* 453, 460 (1966); the right to counsel at pretrial identification procedures, on the ground that these procedures are frequently reliable and that defendants had an alternate route for contesting the suggestivity of the procedure under the due process clause, *Stovall v. Denno*, 388 *U.S.* 293, 297–98, 87 *S.Ct.* 1967, 1970, 18 *L.Ed.2d* 1199, 1203–04 (1967); and the right to counsel at a preliminary hearing where determinations of guilt are not made, *Adams v. Illinois*, 405 *U.S.* 278, 92 *S.Ct.* 916, 31 *L.Ed.2d* 202 (1972). In all of the above cases, the countervailing interests of State reliance on the old rule and the undisrupted administration of justice were held to outweigh the negligible

effect that the old rule had on the integrity of the truth-finding process. Moreover, where there was any question as to the integrity of the truth-finding process, the defendants had alternate ways of attacking the reliability of the evidence.

In *State v. Lueder*, 74 *N.J.* 62 (1977), this Court refused to grant retroactive effect to a rule requiring juvenile courts to afford juveniles counsel and a hearing before waiving jurisdiction over them in favor of an adult prosecution. Relying on *Stovall v. Denno, supra,* we emphasized that the waiver proceeding played no real part in the ultimate guilt-finding process and thus denied retroactivity. 74 *N.J.* at 77–78.

The rule announced in *Cerbo* falls within two of these categories. It falls within the first category, deterrence of illegal police conduct, because the suppression sanction is meant to insure police compliance with the statutory sealing command in *all* cases, regardless of how accurate the police may later claim the tapes to be. *See State v. Cerbo, supra,* 78 *N.J.* at 603. This deterrent purpose militates against retroactive application, as previously explained. The sealing requirement also falls within the third category, rules designed to enhance the reliability of the truth-finding process, because it is intended to insure the integrity and authenticity of the tapes. *Cerbo, supra,* 78 *N.J.* at 602. However, delays in sealing do not necessarily result in altered tapes or tampering. *See, e. g., Cerbo, supra; United States v. Angelini, supra,* 565 *F.*2d at 471–73; *McMillan v. United States, supra,* 558 *F.*2d at 878–79; *United States v. Sklaroff, supra,* 506 *F.*2d at 840; *United States v. Falcone, supra,* 505 *F.*2d at 483–84. Moreover, we do not believe that the delays in sealing that occurred prior to *Cerbo* "substantially" impaired the very integrity of the truth-finding process in all those cases. On the contrary, in cases such as the present one and *Cerbo*, where the accuracy of the tapes is conceded, the sealing delay does not have "the slightest impact" on the guilt or innocence of a given defendant. *Cerbo, supra,* 78 *N.J.* at 607. Moreover, should a case arise where the defendant does contest the accuracy of the tapes, he has an alternate way of challenging

the integrity of the tapes by means of an evidentiary objection and hearing. In this case, therefore, we conclude that the extent to which the sealing delay impaired the accuracy of the truth-finding process was virtually nonexistent.

Having concluded our discussion of the first factor, the purpose of the new rule, we will now weigh the second and third factors, reliance and effect on the administration of justice, to see if either militates in favor of retroactivity.

The State's reliance on prior law is not as firmly justified as it was in *Catania, Carpentieri,* and *Howery,* where the old practice had been expressly sanctioned by prior law. *Catania, supra,* 85 *N.J.* at 447; *Carpentieri, supra,* 82 *N.J.* at 548; *Howery, supra,* 80 *N.J.* at 570–71. Neither the unpublished Appellate Division opinion in *State v. Gaffey, supra,* the opinion by divided Appellate Division panel in *State v. Cerbo, supra,* nor the line of cases interpreting the federal sealing provision gave the State such concrete assurance that its conduct would be upheld. Nevertheless, the clear preponderance of case law was such as to give the State some reasonable expectation that a sealing delay would not result in suppression of the tapes. Certainly its conduct did not amount to bad faith or insolence. *See Cerbo, supra,* 78 *N.J.* at 607.

Finally, even limited retroactive application of *Cerbo* would have a drastic effect on the administration of justice. The State has represented that, in Essex County alone, retroactivity would require the retrial of or dismissal of counts against at least 60 defendants. On a statewide basis, even limited retroactivity would presumably require additional retrials and dismissals that might burden our courts and other branches of our criminal justice system. As for complete retroactivity, the costs such application would inflict on our administration of justice are virtually incalculable.

Weighing the above three factors, we find that retroactivity would drastically burden the administration of justice. We also find that the State justifiably relied on the only case

law available to it at the time as well as the regular acquiescence of our judges in sealing delays. Turning to the purpose of the *Cerbo* rule, we find that the deterrent purposes of that rule would not be furthered at all by retroactive application. As for the rule's purpose of guaranteeing tape integrity and authenticity, we find that retroactive application would further that purpose only negligibly. We say this because, in the present case, the integrity of the tapes was conceded. We know of no pending cases where a sealing delay has been alleged to result in tampering or to have otherwise impugned the integrity of the tapes. Finally, any defendant wishing to challenge the integrity of the tapes being offered against him has an alternate means of doing so: he can request an evidentiary hearing to contest the integrity of those tapes pursuant to *R*.3:13–1(b). *See* Arnold, *Criminal Practice and Procedure* (2d ed. 1980) § 1034. Therefore, we hold that *Cerbo* should not be applied retroactively. Nothing we say should be construed to detract from the continuing force and validity of *Cerbo*. Nor does this opinion impair the right of a defendant to challenge the accuracy and integrity of tapes that were not sealed in accordance with *N.J.S.A.* 2A:156A–14.

## III.

### USE OF DERIVATIVE EVIDENCE

Burstein and Greenhause have raised the question of whether derivative evidence from tapes that were suppressed because of a sealing violation must also be suppressed. Although our decision not to apply *Cerbo* retroactively and suppress the tapes makes it unnecessary to decide this question, we nevertheless believe that it would be appropriate to address the issue because it has been fully briefed and argued, and because the situation may arise in the future if tapes are suppressed because of a post-*Cerbo* sealing violation.

The defendants have argued that the plain language of the sealing provision requires the suppression of derivative

evidence as well as the tapes. They rely principally upon
*N.J.S.A.* 2A:156A–14:

> The presence of the seal provided by this section, or a satisfactory explanation
> for its absence, shall be a prerequisite for the disclosure of the contents of any
> wire or oral communication, or *evidence derived therefrom,* under subsection b
> of section 17 of this act. [Emphasis added].

On its face the above language would appear to bar the use at
trial not only of the Greenhause tapes, but of any evidence
derived from those tapes. This result has been reached by at
least one court interpreting the identical "evidence derived
therefrom" language of the federal sealing provision. *United
States v. Caruso,* 415 *F.Supp.* 847, 850 n. 2 (S.D.N.Y.1976), aff'd,
553 *F.*2d 94 (2d Cir. 1977).[5] The logic of suppressing derivative
evidence in cases involving a sealing violation is simple: much of
the deterrent sting would be taken out of the suppression
sanction announced in *Cerbo* if police could use unsealed tapes to
secure additional tapes or evidence, which would be admissible
against those as to whom the unsealed tapes are inadmissible.
There are, however, other features of *N.J.S.A.* 2A:156A–14
which lead us to hold that evidence derived from an unsealed
tape need not necessarily be suppressed.

The Legislature, by restricting the suppression sanction to
prohibiting use of the tapes under subsection b of section 17,
deliberately left open the possibility that the tapes might be
used under subsection a of that section. Subsection a allows a
law enforcement officer to disclose the contents of a wiretap "to
another investigative or law enforcement officer to the extent
that such disclosure or use is appropriate to the proper perform-
ance of his duties." *N.J.S.A.* 2A:156A–17 a. Such use would
extend to establishing probable cause for future wiretaps and
search warrants, as the legislative history of the virtually identi-
cal federal sealing provision indicates. 1968 *U.S.Code Cong. &
Admin.News,* pp. 2122, 2188. Thus, the policy of allowing

---

[5]*Caruso* has since been effectively overruled by *United States v. Fury,* 554
*F.*2d 522 (2d Cir. 1977), for reasons which will be discussed shortly.

the tapes to be used to establish probable cause conflicts with the policy of suppressing both the unsealed tapes and "evidence derived therefrom."

This issue has arisen several times in the Second Circuit. In *Caruso, supra*, 415 *F.Supp.* at 850 n. 2, the court said in *dicta* that evidence derived from unsealed tapes should be suppressed. However, in *United States v. Fury*, 554 *F.*2d 522 (2d Cir. 1977), the Second Circuit held admissible the evidential by-products derived from tapes that were themselves inadmissible due to the 14-day sealing delay. In reaching its decision, the court relied on the federal legislative history, which indicated that proper sealing was not a prerequisite for use of the tapes to establish probable cause for future wiretaps, and on the fact that the sealing delay was a post-intercept violation which did not render the wiretap void at the outset. 554 *F.*2d at 531–32.

The foundation for this latter reasoning had been established in *United States v. Ricco*, 421 *F.Supp.* 401 (S.D.N.Y.1976). In that decision, post-intercept violations such as a sealing delay were distinguished from violations which render a wiretap void at the outset (such as deficiencies in the order). The latter class of violations usually amounts to a search and seizure that is already illegal at the time the derivative evidence is acquired. In the former class of violations, however, the intrusion is often lawful at the time the derivative evidence is obtained. A subsequent sealing delay which simply violates a statutory prophylactic rule was thus deemed not to contaminate retroactively the earlier lawful use of the tapes to establish probable cause. Unsealed tapes were analogized to hearsay evidence, which is not sufficiently reliable to justify its admission at trial, but which may nevertheless be used to establish probable cause. 421 *F.Supp.* at 404 n. 3.

This reasoning may guide us in our attempt to resolve these two competing interpretations of *N.J.S.A.* 2A:156A–14. In the present case, the Burstein wiretap was begun three days before the Greenhause wiretap ended. At that time the sealing re-

quirement had not yet been triggered and the wiretap was still lawful. Search warrants were executed soon after the Greenhause wiretap ended and were based largely on information gathered from the Burstein wiretap, which did not involve a sealing delay. Because these evidential by-products were derived prior to the sealing delay, at a time before the Greenhause tapes became contaminated, we would hold them admissible even if the failure to seal required suppression of the Greenhause tapes. Had the derivative evidence been obtained after the sealing delay tainted the tapes and made their integrity suspect, a different result might be appropriate. On that question we reserve judgment.

## IV.

### MINIMIZATION

It is also contended that the State failed to make reasonable efforts to comply with its minimization obligations during the course of the Greenhause wiretap.

The minimization provision of our Wiretap Act, *N.J.S.A.* 2A:156A–12(f), provides in pertinent part that:

> Every order entered under this section shall require that such interception begin and terminate as soon as practicable and be conducted in such a manner as to minimize or eliminate the interception of such communications not otherwise subject to interception under this act by making reasonable efforts, whenever possible, to reduce the hours of interception authorized by said order.

In *State v. Catania, supra,* 85 *N.J.* at 422–423, decided today, we held that the State, in addition to "extrinsically" minimizing by making reasonable efforts to reduce the authorized hours of interception, must "intrinsically" minimize by making reasonable efforts to terminate its interception of non-relevant conversations within the authorized wiretapping hours. We also held that, not only must the actual minimization have been objectively reasonable, but that the police must have made a subjective good-faith effort at the time to comply with their minimization obligations. We are satisfied from the facts of this case that the State has fulfilled all of the above minimization requirements.

■ First, it was reasonable for the State not to reduce its hours of interception after it had been authorized to wiretap Greenhause's phone 24 hours a day. In so concluding we reject the defendants' contention that the State should have ceased monitoring phone calls between the hours of 12:45 a. m. and 7:55 a. m. In formulating their argument, the defendants point out that only seven incriminating calls were intercepted during the midnight to 8:00 a. m. shift, and that all of these occurred either before 12:45 a. m. or after 7:55 a. m. This argument overlooks several points. First, the veteran law enforcement officers who supervised the wiretap knew from their experience that conspiracies such as this one are characterized by transactions both at night and during the early morning hours. More significantly, Greenhause often made criminal calls late in the evening, well up until midnight. Also, he used his phone extensively during the early morning hours. The State had no way of knowing in advance that Greenhause would not make more criminal phone calls during those hours than he eventually did. We therefore conclude that it was reasonable for the State not to cease its interceptions during those hours.

■ The defendants also contest vigorously the sufficiency of the State's intrinsic minimization efforts. The disputed phone conversations occurred between Greenhause and his girlfriend, primarily during the early morning hours. Many of them were deeply personal and emotionally turbulent. Although we do not reach this decision easily, we find that it was reasonable for the State to intercept these calls.

■ In *Catania, supra,* 85 *N.J.* at 433–434, we set out three factors to be considered in assessing the reasonableness of the State's intrinsic minimization efforts: (1) the nature of certain phone calls, which may make minimization difficult; (2) the scope of the enterprise under investigation; and (3) the reasonable expectations of the monitors, at that stage of the conspiracy, as to the nature of the conversation. The first consideration concerns phone calls that were too short to mini-

mize or calls that employ ambiguous or guarded language, and is not relevant here. As to the second consideration, however, the extensive nature of the conspiracy under investigation justified surveillance that was correspondingly extensive. As for the third consideration, the monitors knew that Greenhause frequently discussed the details of the conspiracy with his girlfriend. A pattern of relevant conversations between the two had begun to emerge. Despite the personal nature of many of these conversations, they were frequently peppered with references to criminal activity. These included references by Greenhause to his drug business or his associates, threats by his girlfriend to go to the police or otherwise divulge facts about the conspiracy, and references to other criminal activities. It was reasonable for the police monitors to except that any given incoming call would relate to the conspiracy.

Finally, we conclude that the police made good faith efforts to minimize at the time of the wiretap. The supervising officers were aware of their minimization obligations and were given detailed instructions on how to minimize. Most importantly, the police did terminate their interception of numerous conversations, including several calls between Greenhause and his girlfriend. Although some additional calls might conceivably have been minimized, we have never required the State to minimize its interception of all non-relevant phone calls. This would require a prescience on the part of the police that is simply not possible. Rather, we require only that the State make reasonable efforts to terminate its interception of non-relevant phone calls. Our review of the facts in this case convinces us that such efforts were made here.

## V.

## CONCLUSION

In conclusion, we hold that *Cerbo* is not to be applied retroactively, even in a limited fashion, to cases that had not yet exhausted their avenues of direct review at the time of the

decision. The suppression sanction announced in *Cerbo* will be invoked only in cases where sealing violations occurred after February 2, 1979, the date of that decision.

We further conclude that, even if the tapes had been suppressed, evidence derived from them would nevertheless have been admissible at trial under the circumstances of the *Burstein* case.

Finally, we hold that the State complied with its minimization obligations by making reasonable and good faith efforts to minimize both extrinsically and intrinsically.

For the reasons stated herein, the convictions in both cases are affirmed.

PASHMAN, J., dissenting.

I have previously expressed at length my views on the issue of whether particular judicial decisions affecting the rights of criminal defendants should receive limited retroactivity. *State v. Carpentieri*, 82 *N.J.* 546, 556 (1980) (Pashman, J., dissenting); *State v. Howery,* 80 *N.J.* 563, 575 (Pashman, J., dissenting), *cert.* denied, 444 *U.S.* 994, 100 *S.Ct.* 527, 62 *L.Ed.2d* 424 (1979). Because the reasons I found in *Carpentieri* and *Howery* for limited retroactive application of the rules at issue there apply as well to the rule announced by this Court in *State v. Cerbo*, 78 *N.J.* 595 (1979), I respectfully dissent.

Very briefly, I believe that application of the *Cerbo* rule, which in the cases at bar results in the suppression of the Greenhause tapes in *State v. Burstein* and all the tapes in *State v. Barrise,* serves the purpose of preserving "the imperative of judicial integrity." *Mapp v. Ohio,* 367 *U.S.* 643, 659, 81 *S.Ct.* 1684, 1693, 6 *L.Ed.2d* 1081 (1961). Furthermore, consistent with my reasoning in *Carpentieri* and *Howery*, cases pending direct review in our courts should be decided on the basis of our ruling in *Cerbo.*

There is little wisdom and no fairness in "[s]imply fishing one case from the stream of appellate review, using it as a vehicle for pronouncing new ...

standards, and then permitting a stream of similar cases subsequently to flow by unaffected by that new rule . . . ." [*Mackey v. United States,* 401 *U.S.* 667, 679, 91 *S.Ct.* 1160, 1173, 28 *L.Ed.*2d 404 (1971) (Harlan, J., concurring and dissenting)] [*State v. Carpentieri, supra,* 82 *N.J.* at 570 (Pashman, J., dissenting)]

Contrary to the assertion of the majority, limited retroactivity would not have such "a drastic effect on the administration of justice," *ante* at 410, that our courts should compromise "the imperative of judicial integrity."

Aside from the question of retroactivity, I agree with the majority on the other issues decided in these cases. I would modify and affirm the judgment of the Appellate Division in *State v. Burstein,* 172 *N.J.Super.* 388 (1980), and I would reverse the judgment of the Appellate Division in *State v. Barrise,* 173 *N.J.Super.* 549 (1980).

*For affirmance*—WILENTZ and Justices SULLIVAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—6.

*For modification and affirmance in part and reversed in part* —Justice PASHMAN—1.