# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4080-17T2

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

P.P.D.,

     Defendant-Appellant.

_____

Submitted January 27, 2020 – Decided April 28, 2020

Before Judges Rothstadt, Moynihan and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Warren County, Docket No. 08-05-0215.

Joseph E. Krakora, Public Defender, attorney for appellant (Seon Jeong Lee, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Regina M. Oberholzer, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Defendant P.P.D. was charged in a four-count indictment with crimes related to multiple sexual assaults of his niece-by-marriage, A.T., during sleepovers at his house with her cousins, defendant's children, one of whom, J.D., was A.T.'s age. The assaults commenced in October 1997 and ended in February 2002; A.T. was between the ages of six and ten years-old.[1] Defendant was convicted by jury of two counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a) (counts one and two), second-degree sexual assault, N.J.S.A. 2C:14-2(b) (count three), and third-degree endangering the welfare of a child related to the sexual assaults, N.J.S.A. 2C:24-4(a) (count four). We affirmed his conviction in April 2016, remanding only for reconsideration of the Sex Crime Victim Treatment Penalty imposed. State v. P.P.D., A-4941-12 (App. Div. Apr. 1, 2016). The Supreme Court denied defendant's petition for certification. State v. P.P.D., 227 N.J. 251 (2016).

Defendant appeals[2] from the January 9, 2018 order denying his petition for post-conviction relief (PCR). His sole point on appeal is:

_____

[1] We use initials to protect the privacy of A.T. See N.J.S.A. 2A:82-46; R. 1:38-3(c)(9), (12).

[2] We granted defendant's motion to file his notice of appeal as within time on May 29, 2018. Both that motion and defendant's notice of appeal were filed on May 15, 2018.

THIS COURT SHOULD GRANT DEFENDANT'S PETITION FOR [PCR] BECAUSE THE STATE'S [CHILD SEXUAL ASSAULT ACCOMMODATION SYNDROME (CSAAS)] EVIDENCE ADMITTED AT DEFENDANT'S TRIAL WAS UNRELIABLE EXPERT TESTIMONY, AS HELD RECENTLY IN STATE V. J.L.G., 234 N.J. 265 (2018)[,] REVERSING STATE V. J.Q., 130 N.J. 554 (1993), THAT FUNCTIONED TO BOLSTER A.T.'S TESTIMONY UPON WHICH DEFENDANT'S CONVICTION WAS SOLELY BASED, DEPRIVING DEFENDANT OF HIS CONSTITUTIONAL RIGHT TO FUNDAMENTAL DUE PROCESS.

We determine the new rule of law announced by our Supreme Court should not be applied with full retroactive effect and affirm.

During the pendency of this appeal, our Supreme Court decided State v. J.L.G., 234 N.J. 265 (2018), holding:

Based on what is known today, it is no longer possible to conclude that CSAAS has a sufficiently reliable basis in science to be the subject of expert testimony. We find continued scientific support for only one aspect of the theory — delayed disclosure — because scientists generally accept that a significant percentage of children delay reporting sexual abuse.

We therefore hold that expert testimony about CSAAS in general, and its component behaviors other than delayed disclosure, may no longer be admitted at criminal trials. Evidence about delayed disclosure can be presented if it satisfies all parts of the applicable evidence rule. See N.J.R.E. 702. In particular, the State must show that the evidence is beyond the understanding of the average juror.

3

[Id. at 272 (emphasis added).]

Our decision on direct appeal fully delineated the facts of this case and we will not repeat them here except as germane to this case. Defendant did not cease assaulting A.T. in 2002 because A.T. disclosed the attacks to anyone. They stopped when defendant's wife advised A.T.'s parents that defendant was arrested for sexually abusing three of J.D.'s friends during sleepovers at his house. Although, after that arrest, A.T.'s parents asked her if anything inappropriate occurred at defendant's house and they sent her to therapy, A.T. did not disclose the abuse to her father until 2004. A.T.'s parents engaged her in further counseling after her unspecific disclosure to her father. A.T. and her family, sometimes aided by the therapist, periodically discussed pressing charges against defendant but did not do so until 2008.

At defendant's trial, the State called Dr. Anthony D'Urso who testified as an expert in CSAAS. After explaining that the theory behind CSAAS was to "help people understand [how] the dynamics of child sexual assault . . . might differ from adult sexual assault," he testified at length regarding all five component behaviors of CSAAS: secrecy, helplessness, accommodation, delayed disclosure and recantation, including explanations about coercion,

entrapment, and psychological accommodation, as well as accidental and purposeful disclosures.

We recognize the CSAAS evidence ran afoul of the Court's holding in J.L.G. because it encompassed four of the prongs now precluded from admission, and also contravened the Court's admonition:

> Trial judges must exercise care to limit the testimony and bar any reference to "CSAAS," an abuse "syndrome," other CSAAS "behaviors" aside from delayed disclosure, or causes for delayed disclosure. The testimony should not stray from explaining that delayed disclosure commonly occurs among victims of child sexual abuse, and offering a basis for that conclusion.
>
> [234 N.J. at 303.]

Further, the then twenty-year-old A.T. was clearly able to articulate at trial her uncomplicated reasons for delayed disclosure. She explained that although she disclosed the abuse to her mother, father, and therapist in 2004, she did not go to the police because

> I wasn't ready to. That was the first time my parents found out. That was the first time any of my loved ones knew. So I wasn't ready to, first of all, lose [J.D.] as a friend. I was scared to see their reactions. Scared of what [defendant] was going to do. I didn't want anything to change.

A-4080-17T2

She testified that she decided to disclose the abuse in 2008 after having multiple discussions with her boyfriend, and after her mother asked if she was ready to press charges.

A.T.'s therapist testified: A.T. and she discussed going to the police for "[a]n enormous amount of time"; A.T. told her that she did not disclose the abuse earlier because she was concerned "[w]hat the process would be . . . and how difficult that would be"; and that A.T's reservations about pressing charges were:

> What would happen, that there would be little or no jail time, that she would go through this horrific process of having to talk about the abuse in an open [c]ourt, how many people she would have to tell, versus what would, you know, what would be the outcome, would he be punished. She would never see the cousins.

Those reasons were not "beyond the ken of the average juror," J.L.G., 234 N.J. at 304 (quoting State v. Kelly, 97 N.J.178, 208 (1984)). The J.L.G. Court held it is the State's burden to make that showing before delayed-disclosure expert testimony is admitted. Id. at 272. Under N.J.R.E. 702, "expert testimony is not appropriate to explain what a jury can understand by itself." J.L.G., 234 N.J. at 305. As the Court explained:

> If a child witness cannot offer a rational explanation for the delay in disclosing abuse -- which may happen during the pretrial investigative phase or on the witness stand -- expert evidence may be admitted to help the jury understand the child's behavior. In this context, we

6

> do not accept that jurors can interpret and understand an explanation that is not offered.
>
> On the other hand, a young teenager's explanation from the witness stand may fall within the ken of the average juror and might be assessed without expert testimony.
>
> [Ibid.]

Thus, if defendant's trial took place today, the expert delayed-disclosure testimony would not have been admitted at trial. See ibid. (noting that the victim's reasons for her delayed disclosure fell within the ken of the average juror where the victim testified she waited to disclose the abuse because "(a) defendant threatened her with a gun, (b) she was embarrassed by the degrading experiences, and (c) she feared that her mother would kill defendant . . ."). A.T.'s reasons for non-disclosure were clear and uncomplicated. The jury did not need expert testimony to understand them.

The admission of the CSAAS testimony was not harmless error in light of the limited physical evidence of the charged crimes. The linchpin of this case was A.T.'s credibility. "An error is harmless unless, in light of the record as a whole, there is a 'possibility that it led to an unjust verdict' -- that is, a possibility 'sufficient to raise a reasonable doubt' that 'the error led the jury to a result it

A-4080-17T2

otherwise might not have reached.'" Id. at 306 (quoting State v. Macon, 57 N.J. 325, 335-36 (1971)).

In J.L.G., the Court determined the admission of the expert CSAAS testimony constituted "harmless error," incapable of affecting the outcome of the case, because the State presented an overwhelming amount of evidence at trial corroborating the defendant's guilt which was not dependent on the jury's assessment of the victim's credibility, including an audio recording of the defendant's assault, an eyewitness account of the defendant sexually aroused while lying on top of the victim, and police-recorded telephone conversations in which the defendant offered the victim bribes to refrain from testifying. Ibid.

In contrast, we recently determined that the admission of CSAAS expert testimony in four different cases, consolidated on appeal, constituted harmful error. See State v. G.E.P., 458 N.J. Super. 436, 449 (App. Div.), certif. granted, 239 N.J. 598 (2019). In each of those four cases we determined the admission of expert CSAAS evidence at trial unduly bolstered the victim's credibility and could not be considered "harmless error," observing there was little or no corroborating physical evidence introduced at each trial, and the credibility of each victim's testimony was the linchpin of the State's case. Ibid.

Here, the State's case predominantly relied on A.T.'s detailed testimony, including the time and place of each assault occurred, how defendant positioned her during the assaults, her reasons for both her delayed disclosure of the abuse, and for going to the police. All the other State's witnesses testifying at trial learned about the abuse from A.T. Although on one occasion, A.T.'s underwear was found on the floor on the morning after an assault, no one observed any assault. The admission of the CSAAS testimony, therefore, raised "a possibility 'sufficient to raise a reasonable doubt' that 'the error led the jury to a result it otherwise might not have reached.'" J.L.G., 234 N.J. at 306 (quoting Macon, 57 N.J. at 335-36)

Although defendant's counsel presciently argued during the new-trial motion that "the Supreme Court has to revisit the issue because CSAAS goes back to the [19]80's and really has been undercut in terms of the science and the author's own discounting and disapproval of the way that it's used forensically," defendant did not raise a CSAAS issue on direct appeal. Of course, J.L.G. was not filed until July 31, 2018, well after the resolution of defendant's direct appeal and PCR petition before the trial court, and after we granted permission for this late-filed appeal.

9

The issue becomes, therefore, the extent of retroactivity applied to J.L.G.[3]

"[R]etroactivity can arise only where there has been a departure from existing law." State v. Burstein, 85 N.J. 394, 403 (1981). In determining whether a case raises a new rule of law, there must be a "sudden and generally unanticipated repudiation of a long-standing practice." State v. Afanador, 151 N.J. 41, 58 (quoting State v. Cupe, 289 N.J. Super. 1, 12 (App. Div. 1996)). That is, it must "break[] new ground or impose[] a new obligation on the . . . government"; "if the result was not dictated by precedent existing at the time the defendant's conviction became final," it will be considered a new rule. State v. Lark, 117 N.J. 331, 339 (1989) (quoting Teague v. Lane, 489 U.S. 288, 301 (1989)).

The J.L.G. Court reviewed de novo whether the reliability of CSAAS testimony was established under the Frye test.[4] 234 N.J. at 301. Such testimony had been widely utilized by prosecutors who relied on the cases endorsing its use, G.E.P., 458 N.J. Super. at 447, beginning with State v. J.Q., 130 N.J. 554,

---

[3] Defendant did not argue for full retroactivity of J.L.G. until he filed his reply brief. Although "a new issue cannot be raised in a reply brief" on appeal, Alpert, Goldberg, Butler, Norton & Weiss, P.C. v. Quinn, 410 N.J. Super. 510, 527 n.5 (App. Div. 2009), we will address the issue.

[4] Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923) (holding admissibility of proposed expert testimony is conditioned on whether the scientific basis for the opinion has "gained general acceptance in the particular field in which it belongs").

A-4080-17T2

556 (1993) (finding CSAAS had a "sufficiently reliable scientific basis" to justify presentation to a jury). The Court's prohibition of the introduction of CSAAS-related expert testimony on any of the five syndrome factors except delayed disclosure, J.L.G., 234 N.J. at 303, cannot be viewed as anything but a new rule of law.

That having been determined, we can

> (1) make the new rule of law purely prospective, applying it only to cases whose operative facts arise after the new rule is announced; (2) apply the new rule to future cases and to the parties in the case announcing the new rule, while applying the old rule to all other pending and past litigation; (3) grant the new rule [pipeline] retroactivity, applying it to cases in (1) and (2) as well as to pending cases where the parties have not yet exhausted all avenues of direct review; and, finally, (4) give the new rule complete retroactive effect[.]
>
> [Burstein, 85 N.J. at 402-03.]

In G.E.P, we concluded J.L.G.'s holding "should be given at least pipeline retroactivity," G.E.P, 458 N.J. Super. at 448, rendering it applicable to all prospective cases arising after the announcement of the new rule of law, parties in the case considered, and pending cases in which "the parties have not yet exhausted all avenues of direct review," Burstein, 85 N.J. at 403, when the Court issued its opinion in J.L.G. Judge Koblitz cogently analyzed the three factors

considered in determining whether a new rule of law should be made purely prospective, prospective but applicable to the case announcing the new rule, retroactive to cases in the pipeline or completely retroactive:

> "(1) the purpose of the rule and whether it would be furthered by a retroactive application, (2) the degree of reliance placed on the old rule by those who administered it, and (3) the effect a retroactive application would have on the administration of justice."
>
> [G.E.P., 458 N.J. Super at 445 (quoting Feal, 194 N.J. at 308).]

The first factor is the "most pivotal" and requires the court to consider whether "the purpose of the new rule 'is to overcome an aspect of the criminal trial that substantially impairs its truth-finding function' and raises 'serious question[s] about the accuracy of guilty verdicts in past trials [.]'" Ibid. (first alteration in original) (quoting Feal, 194 N.J. at 308-09). If the purpose of the new rule was to remedy an aspect of a criminal trial which substantially impaired the "truth-seeking function" of the trial, retroactive effect generally should be given; however, if the "new rule is designed to enhance the reliability of the fact-finding process, but the old rule did not 'substantially impair' the accuracy of that process, a court will balance the first [factor] against the second and third [factors]." Id. at 446 (alterations in original) (quoting Feal, 194 N.J. at 309).

12

J.L.G. does not fall into that class of cases where "fundamental constitutional implications" mandate full retroactivity, State v. Purnell, 161 N.J. 44, 54 (1999), such as those recognized by our colleagues in G.E.P., as striking "at the heart of the truth-seeking function," 458 N.J. Super. at 445-46. Unlike those cases where full retroactivity has been accorded, the severe curtailment of CSAAS evidence imposed by the J.L.G. Court does not involve altering the burdens of proof, Hankerson v. North Carolina, 432 U.S. 233 (1977); Ivan V. v. City of New York, 407 U.S. 203 (1972) or the right to counsel at critical stages, Arsenault v. Massachusetts, 393 U.S. 5 (1968); Pickelsimer v. Wainwright, 375 U.S. 2 (1963); see also Feal, 194 N.J. at 309.

In contrast to those cases, full retroactivity has not been afforded to new rules of law that simply "affect[] the jury's assessment of the victim's credibility." State v. J.A., 398 N.J. Super. 511, 524 (App. Div. 2008) (refusing to grant complete retroactive effect to a new rule because the old rule simply "affected the jury's assessment of the victim's credibility, [and] was [not] a 'substantial' impairment of the truth-finding process" (citing State v. R.E.B., 385 N.J. Super. 72, 84-86 (App. Div. 2006))); see also Feal, 194 N.J. at 310 (refusing to apply a new rule of law which recategorized "comments on a defendant's presence at trial as interdicted under all circumstances," in part, because the "old

13

rule was a well-settled and legitimate means of fairly attacking a defendant's credibility").

CSAAS testimony was previously admitted to explain a child victim's reaction to sexual assault. Prior to J.L.G., the jury was instructed they can consider CSAAS testimony to help "explain[] certain behavior[s] of the alleged victim of child sexual abuse" and "help explain why a sexually abused child may . . . delay reporting[,] . . . recant allegations of abuse . . . [or] deny that any sexual abuse occurred[.]" Model Jury Charges (Criminal), "Child Sexual Abuse Accommodation Syndrome" (rev. May 16, 2011); see also G.E.P., 458 N.J. Super. at 462 n.5.

Defendant argues that the admission of CSAAS testimony bolstered A.T.'s testimony. In G.E.P., we discerned the purpose of J.L.G.'s holding was "to avoid unjust convictions in which the State's proofs are unfairly bolstered by expert opinion that lacks a reliable basis." 458 N.J. Super. at 447. Inasmuch as the CSAAS-expert testimony cannot be used to establish a defendant's guilt, it is our judgment that the J.L.G. Court's ruling was "designed to enhance the reliability of the fact-finding process[,] but the old rule did not 'substantially impair' the accuracy of that process." See Burstein, 85 N.J. at 408.

In balancing the two remaining factors—"the degree of reliance placed on the old rule by those who administered it, and . . . the effect a retroactive application would have on the administration of justice," Feal, 194 N.J. at 308 (quoting State v. Knight, 145 N.J. 233, 251 (1996))—we need not ford waters already bridged by our holding in G.E.P., where we recognized the wide utilization of CSAAS testimony by prosecutors who relied on the cases sanctioning its use beginning in 1993, 458 N.J. Super. at 447; see also J.Q., 130 N.J. at 556 (finding CSAAS had a "sufficiently reliable scientific basis" to justify presentation to a jury). Indeed, the J.L.G. Court indicated that the introduction of CSAAS testimony at trial was widespread throughout the State and country. 234 N.J. at 272 ("Courts across the nation embraced [CSAAS as reliable] . . . pav[ing] the way for experts to testify about the syndrome in criminal sex abuse trials").[5]

While we cannot definitively analyze the impact retroactive application would have on the justice system, not knowing the number of convictions in which CSAAS evidence has played a part, we do know that experts have been testifying in trials of defendants accused of child sexual abuse for almost three

---

[5]  We noted there were, at minimum, forty pending appeals involving the admissibility of CSAAS evidence when we decided G.E.P.  See 458 N.J. Super. at 448.

decades. While such evidence may not have been "a staple of criminal trials" like eyewitness identification testimony, see State v. Henderson, 208 N.J. 208, 302 (2011) (determining that "reopen[ing] the vast group of [eyewitness identification] cases decided over several decades . . . would 'wreak havoc on the administration of justice'" (quoting State v. Dock, 205 N.J. 237, 258 (2011))), it was introduced in cases where child-victims had to testify about assaults, the disclosure of which, for many, were then delayed. Retroactive effect would allow defendants who were convicted after trials in which CSAAS evidence was introduced to collaterally attack those convictions. If PCR is granted, the State would be required to marshal evidence if still available and witnesses whose memory would be subject to attack. See ibid. (refusing to grant full retroactive application to a new rule of law, in part, because doing so would require eyewitness to retake the stand at a time where their memories have "have long since faded"). It would also require those victims to recount attacks many of them were initially reluctant to disclose.

We see no reason to stray from our decision in G.E.P, concluding J.L.G.'s holding should receive pipeline retroactivity, 458 N.J. Super. at 448, rendering it applicable to all prospective cases arising after the announcement of the new rule of law, parties in the case considered, and pending cases in which "the

16

parties have not yet exhausted all avenues of direct review," Burstein, 85 N.J. at 403, when the Court issued its opinion in J.L.G.  As such, J.L.G. should not be accorded full retroactivity to afford defendant, who had exhausted all avenues of direct review, relief.  In such cases, courts "will not burden the criminal justice system with the [PCR] and retrials that would result from a fully retroactive application" of a new rule of law."  Knight, 145 N.J. at 258.

We determine the balance of defendant's arguments, including that made in his reply brief that "[i]n J.L.G., the Court announced two holdings:  one novel and the other an application of well-established law under N.J.R.E. 702," the latter of which was not a new rule of law, to be without sufficient merit to warrant discussion.  R. 2:11-3(e)(2).  Not only was this issue raised in a reply brief, see Alpert, 410 N.J. Super. at 527 n.5, and was not raised to the PCR court, see State v. Robinson, 200 N.J. 1, 19-20 (2009), it also improperly parses the Court's decision in J.L.G.  Moreover, that argument attacks the admission of the CSAAS evidence as contravening N.J.R.E. 702.  As the argument was not raised on appeal, but was evident in the record, defendant cannot raise it in this PCR proceeding.  R. 3:22-4; see also State v. McQuaid, 147 N.J. 464, 483 (1997) ("A defendant ordinarily must pursue relief by direct appeal, . . . and may not use

post-conviction relief to assert a new claim that could have been raised on direct appeal" (citation omitted)).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4080-17T2