942 A.2d 149 (2008)
398 N.J. Super. 511
STATE of New Jersey, Plaintiff-Respondent
v.
J.A., Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued February 7, 2008.
Decided March 6, 2008.
*150 Jane M. Personette, Designated Counsel, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney; Ms. Personette, on the brief).
Catherine A. Foddai, Assistant Prosecutor, argued the cause for respondent (John L. Molinelli, Bergen County Prosecutor, attorney; Ms. Foddai, of counsel and on the brief).
Before Judges PARRILLO, S.L. REISNER and GILROY.
The opinion of the court was delivered by
*151 PARRILLO, J.A.D.
The novel issue in this, appeal from the Law Division's denial of a post-conviction relief (PCR) petition is whether the Supreme Court's decision in State v. P.H., 178 N.J. 378, 840 A.2d 808 (2004), that a jury may consider the timing of a victim's disclosure of sexual abuse in assessing credibility, is to be given complete retroactivity to encompass cases on collateral review, where all avenues of direct appeal have been exhausted. For the following reasons, we hold the rule of P.H., which disapproved the contrary. holding of State v. Bethune, 121 N.J. 137, 578 A.2d 364 (1990), is to be afforded pipeline retroactivity only.
Following a trial by jury, defendant J.A. was convicted of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1). The victim was A.F., his nephew, who was between seven and nine years old when the sexual abuse took place and fourteen years old when he testified. The proofs against defendant consisted not only of the charges made against him by the victim, who testified that sometime between 1992 and 1994, defendant sodomized him in a bedroom of his aunt's home, but also defendant's own incriminating statements to the police several years later, after A.F., for the first time, accused his uncle of molesting him.
At the time of the rape, A.F. did not tell anyone what had happened because he was scared. Then several years later, on January 3, 1998, while eating dinner with his family and discussing an evening television news story about a child sexual assault that evidently made him confront the memory of his uncle molesting him, A.F., who was then twelve years old, suddenly began crying. When asked what was the matter, A.F. said defendant had "molested" him. His mother and stepfather immediately took A.F. to the Bogota police station, where he gave a statement. Two days later, on January 5, 1998, A.F. gave a sworn statement to Sergeant Haviland, an investigator from the Bergen County Prosecutor's Office, to the same effect as his later trial testimony.
After confronted by police with A.F.'s accusation and informed of his Miranda[1] rights, defendant, appearing to know specifically what he was alleged to have done, stated, "I just want to get it exact. He said I screwed him in the ass." Haviland confirmed that this was the substance of A.F.'s allegation.
During the subsequent two-hour interview, defendant initially denied the charge, but then told officers that he used to drink to the point of blacking out and that perhaps something happened when he was drunk that he could not remember. Later, defendant recalled an incident from "years before" when he had once entered the bathroom to urinate while A.F. was using the toilet and that, as A.F. got up, his rear end accidentally brushed against defendant's penis. Shortly thereafter, however, defendant admitted to Haviland that he was not telling the truth. Eventually, defendant told the "truth," that approximately three years earlier, he entered the bathroom while A.F. was showering. When A.F. stepped out of the shower, defendant touched A.F.'s butt cheeks with his penis "to see if [A.F.] liked it." Defendant claimed nothing was said between the two and that he intended to "screw" A.F., but that he heard his wife approaching and quickly left the bathroom.
During his ensuing stenographic statement, defendant altered his story yet again, still conceding that he rubbed his penis against A.F.'s buttocks, but denying *152 that he intended to "screw" A.F. At the conclusion of the statement, when Haviland confronted him on his changed story, defendant apologized and stated he would now tell the truth. In an addendum to defendant's statement, he conceded that he indeed intended to "screw" A.F., but he stopped due to his wife's arrival.
At trial, however, defendant denied the charge as well as the truth of his earlier admissions to the police. At the conclusion of testimony, defendant requested a jury charge permitting the jury to consider the prolonged period of time between the alleged incident and A.F.'s disclosure. The trial judge denied defendant's request and charged the jury pursuant to State v. Bethune, 121 N.J. 137, 578 A.2d 364 (1990), as follows:
You are instructed that a child may not complain or tell anyone of sexual abuse for a myriad of reasons, including fear, ignorance, or confusion.
You therefore, may not consider the child's failure to complain as evidence weighing against the credibility of the child because silence is one of the many ways a child may respond to sexual abuse.
Evidently crediting the State's proofs, the jury found defendant guilty as charged. Defendant was sentenced to twelve years imprisonment, and appropriate statutory penalties were also imposed. The trial judge classified defendant as an offender pursuant to Megan's Law, N.J.S.A. 2C:7-2(b)(1), and imposed community notification for life.
On appeal, defendant argued, among other things, that the trial judge erred in failing to charge the jury that it was permitted to infer from the length of A.F.'s delay that his allegation was fabricated. We affirmed defendant's conviction and sentence, State v. J.A., No. A-2515-00T3 (App. Div. June 13, 2002) (slip op. at 20), specifically upholding the trial judge's decision not to charge the jury as requested by defendant:
[T]he trial judge simply instructed, consistent with Bethune, supra, that the jury "may not consider the child's failure to complain as evidence weighing against the credibility of the child." See [121 N.J.] at 148-49, 578 A.2d 364; State v. Hill, 121 N.J. 150, 166, 578 A.2d 370 (1990). To have supplemented the instruction, as defendant suggests, with the added admonition to infer from the delay that the accusation was fabricated would nullify the very purpose for the charge in the first instance and defeat the protections afforded by Bethune and Hill.
[J.A., supra, at 20.]
Thereafter, on February 5, 2004, the Supreme Court decided State v. P.H., 178 N.J. 378, 840 A.2d 808 (2004), which "clarified" Bethune and held that a jury may consider the timing of a victim's disclosure of sexual abuse in assessing credibility. P.H., supra, 178 N.J. at 397, 840 A.2d 808.[2] Defendant then filed the instant PCR petition on February 15, 2005, arguing that P.H. should be given complete retroactive *153 effect. The PCR judge, who also presided over defendant's trial, denied the petition, both procedurally and on the merits. The judge held that defendant was barred from raising the issue collaterally because it had already been adjudicated on direct appeal, Rule 3:22-5, and that, substantively, the rule of P.H. did not apply retroactively, citing State v. Cupe, 289 N.J.Super. 1, 672 A.2d 1233 (App.Div.), certif. denied, 144 N.J. 589, 677 A.2d 761 (1996).
On appeal from the order denying his PCR petition, defendant contends that the charge given in accordance with the prevailing law at the time, but later disapproved in P.H. after his exhaustion of all avenues of direct appeal, violated his federal and state constitutional rights of confrontation and to due process, and therefore both federal and state retroactivity principles mandate that P.H. be given complete retroactivity and apply to his case on PCR review.
As a threshold matter, we disagree with the PCR judge that Rule 3:22-5 bars defendant from raising the retroactivity issue. The issue of retroactivity, based as it is on the rule of law announced in P.H., decided two years after adjudication of defendant's direct appeal, is neither "identical" nor "substantially equivalent" to the narrow issue previously raised and decided, namely whether the court's jury charge, consistent with the then prevailing law of Bethune, was erroneous. See State v. Marshall 173 N.J. 343, 351, 801 A.2d 1142 (2002). Thus, Rule 3:22-5 does not operate to preclude consideration of the retroactivity issue on collateral review. Nor does Rule 3:22-4 have any preclusive effect. To be sure, defendant never argued on direct appeal that Bethune was wrongly decided. However, that ground for relief could not reasonably have been raised prior to the decision in P.H., R. 3:22-4(a), and in any event, enforcement of the bar would result in a fundamental injustice, R. 3:22-4(b), inasmuch as the question now raised is of substantial import. See State v. Franklin, 184 N.J. 516, 528, 878 A.2d 757 (2005).
Defendant's retroactivity argument is grounded in both state and federal law. We address the former first.
"The threshold question in any retroactivity decision is whether a new rule of law has actually been announced." State v. Burstein, 85 N.J. 394, 403, 427 A.2d 525 (1981). "[Al case announces a new rule when it breaks new ground or imposes a new obligation on the State[ [or] if the result was not dictated by precedent existing at the time the defendant's conviction became final." State v. Molina, 187 N.J. 531, 543, 902 A.2d 200 (2006) (citation omitted). In other words, "[f]or a new rule to evolve, there must be a `sudden and generally unanticipated repudiation of a long-standing practice.'" State v. Afanador, 151 N.J. 41, 58, 697 A.2d 529 (1997) (quoting Cupe, supra, 289 N.J.Super. at 12, 672 A.2d 1233). "There must be some `appreciable past from which the rule departs.'" Ibid. (quoting State v. Burgess, 298 N.J.Super. 254, 268, 689 A.2d 730 (App.Div.1997), aff'd, 154 N.J. 181, 712 A.2d 631 (1998)).
Since it is undisputed here that P.H. announced a new rule of law, we must then determine the retroactive application of the decision. There are four options:
(1) make the new rule of law purely prospective, applying it only to cases whose operative facts arise after the new rule is announced; (2) apply the new rule to future cases and to the parties in the case announcing the new rule, while applying the old rule to all other pending and past litigation; (3) grant the new rule limited retroactivity, applying it to cases in (1) and (2) as well as to pending cases where the parties *154 have not yet exhausted all avenues of direct review; and, finally, (4) give the new rule complete retroactive effect, applying it to all cases, even those where final judgments have been entered and all avenues of direct review exhausted. [State v. Lark, 117 N.J. 331, 339, 567 A.2d 197 (1989) (citations omitted).]
The ultimate determination is based on weighing the following factors: "(1) the purpose of the rule and whether it would be furthered by a retroactive application, (2) the degree of reliance placed on the old rule by those who administered it, and (3) the effect a retroactive application would have on the administration of justice." Ibid. (citation omitted).
The first factor is clearly the most important, "pivotal consideration." State v. Cummings, 184 N.J. 84, 97, 875 A.2d 906 (2005) (citations omitted). "The second and third factors come to the forefront of the retroactivity analysis when the inquiry into the purpose of the new rule does not, by itself, reveal whether retroactive application of the new rule would be appropriate." Id. at 97, 875 A.2d 906 (citation omitted). Importantly, courts have wide discretion in the application of these factors and "the retroactivity determination often turns more generally on the Court's view of what is just and consonant with public policy in the particular situation presented." State v. Colbert, 190 N.J. 14, 28, 918 A.2d 14 (2007) (citations omitted).
As to the first factor, a new rule's purpose may fall into one of three categories. First, "a new rule may be intended solely to deter police misconduct. In such a case, retroactivity would almost certainly be denied because the new rule's deterrent purpose would not be advanced by retroactive application to past misconduct." State v. Purnell, 161 N.J. 44, 54, 735 A.2d 513 (1999) (citation omitted). Second, a new rule may
"`overcome an aspect of a criminal trial that substantially impairs its truth-finding function' and which [raise] `serious questions about the accuracy of guilty verdicts in past trials.'" In those cases, given the fundamental constitutional implications, the new rule is often given "complete retroactive effect, regardless of how much the State justifiably relied on the old rule or how much the administration of justice is burdened."
[Ibid. (citations omitted).]
Finally,
[i]n between these extremes is a third category of cases, where the new rule is designed to enhance the reliability of the factfinding process but the old rule did not "substantially" impair the accuracy of that process. In measuring the extent to which the old rule impaired the truth-finding process, two things should be considered: first, the likelihood of untrustworthy evidence being admitted under the old rule and, second, whether the defendant had alternate ways of contesting the integrity of the evidence being introduced against him. After this determination is made, the extent to which the old rule impaired the reliability of the truth-finding process is then balanced against the countervailing State reliance on the old rule and the disruptive effect that retroactivity would have on the administration of justice.
[Burstein, supra, 85 N.J. at 408, 427 A.2d 525.]
Clearly, the first category is not implicated here. Permitting the jury to consider the time span in which a child reports a sexual assault when assessing a victim's credibility is in no was intended to deter police misconduct. Consequently, we then consider whether the purpose of the new rule is to either "`overcome an aspect of a criminal trial that substantially *155 impairs its truth-finding function' and which [raise] `serious questions about the accuracy of guilty verdicts in past trials[;]'" or "to enhance the reliability of the factfinding process but the old rule did not `substantially' impair the accuracy of that process." See Purnell, supra, 161 N.J. at 54, 735 A.2d 513 (citations omitted). If the former, of course, the new rule will be given complete retroactive effect. If the latter, it will not be applied on collateral review. Thus, resolution of this issue turns on whether the Bethune rule "substantially" impaired the truth-finding process.
The Court in Burstein set forth examples of new rules that have been given complete retroactivity.
Complete retroactivity has thus been given to the requirement that the State may not escape its burden of proof beyond a reasonable doubt by using presumptions to shift burdens of proof to the defense, Hankerson v. North Carolina, 432 U.S. 233, 97 S.Ct. 2339, 53 L.Ed.2d 306 (1977); the requirement that, in juvenile proceedings, the State prove beyond a reasonable doubt all elements of an offense that would constitute a crime if committed by an adult, Ivan V. v. City of New York, 407 U.S. 203, 92 S.Ct. 1951, 32 L.Ed.2d 659 (1972); the right to counsel at preliminary hearings in which a defendant must assert certain defenses or lose them, Arsenault v. Massachusetts, 393 U.S. 5, 89 S.Ct. 35, 21 L.Ed.2d 5 (1968); the rule barring the admission of one co-defendant's extrajudicial confession implicating another defendant, Roberts v. Russell, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100 (1968); the right to counsel at trial, Pickelsimer v. Wainwright, 375 U.S. 2, 84 S.Ct. 80, 11 L.Ed.2d 41 (1963); and the requirement that a confession made some time ago meet current standards of voluntariness, Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961). [Burstein, supra, 85 N.J. at 407, 427 A.2d 525.]
Contrastingly, the Court also referred to cases where a new rule was not given retroactive effect.
Using this analysis, the United States Supreme Court has refused to grant retroactive effect to: the Sixth Amendment right to counsel during interrogation and the Fifth Amendment right to be given Miranda warnings, Johnson v. New Jersey, 384 U.S. 719, 729-30, 86 S.Ct. 1772, 1778-79, 16 L.Ed.2d 882, 890 (1966); the prohibition against commenting on a defendant's failure to testify at trial on the ground that such comments did not present a "clear danger of convicting the innocent," Tehan v. United States ex rel. Shott, 382 U.S. 406, 416, 86 S.Ct. 459, 465, 15 L.Ed.2d 453, 460 (1966); the right to counsel at pretrial identification procedures, on the ground that these procedures are frequently reliable and that defendants had an alternate route for contesting the suggestivity of the procedure under the due process clause, Stovall v, Denno, 388 U.S. 293, 297-98, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199, 1203-04 (1967); and the right to counsel at a preliminary hearing where determinations of guilt are not made, Adams v. Illinois, 405 U.S. 278, 92 S.Ct. 916, 31 L.Ed.2d 202 (1972).
[Burstein, supra, 85 N.J. at 408-09, 427 A 2d 525.]
Key to inclusion in this latter category of cases is the fact that
the countervailing interests of State reliance on the old rule and the undisrupted administration of justice were held to outweigh the negligible effect that the old rule had on the integrity of the truth-finding process. Moreover, where there was any question as to the integrity *156 of the truth-finding process, the defendants had alternate ways of attacking the reliability of the evidence.
[Ibid.]
In State v. R.E.B., 385 N.J.Super. 72, 895 A.2d 1224 (App.Div.2006), for instance, the defendant was convicted for first-degree aggravated sexual assault against his biological daughter. Id. at 76, 895 A.2d 1224. At trial, the victim could not recall exactly when the incidents occurred, but "it was believed that they occurred sometime between 1998 and 2000." Id. at 78, 895 A.2d 1224. It was not until about two years after the alleged abuse that the victim "told her cousin that her father had molested her." Id. at 80, 895 A.2d 1224. "During a formal statement, [the] defendant stated that he [did not] recall [that], anything happen[ed] and if it did[,] it would have occurred [p]robably when I was drunk, if it did happen.'" Id. at 81, 895 A.2d 1224.
The central issue in the case was the victim's credibility, as the defendant's conviction was based almost exclusively on the victim's testimony. Ibid. At trial, the defendant attempted to attack the victim's credibility by offering evidence that the victim had "told her paternal grandmother and `many family members' that she had been sexually assaulted by her coworkers at Burger King and that they had been fired." Ibid. The victim later admitted she had lied. Ibid. The trial court ruled that evidence inadmissible. Ibid.
At the time of the trial judge's ruling, a trait of character could not be proven by specific instances of conduct, with the exception of prior convictions. See id. at 82, 895 A.2d 1224 (citing N.J.R.E. 608). However, two years after the defendant's conviction and while his appeal was pending, the Supreme Court announced a new rule of law establishing an exception to this rule, permitting "a defendant to challenge a victim-witness' credibility by introducing evidence that the victim has made prior false criminal accusations." Ibid. (citing State v. Guenther, 181 N.J. 129, 154, 854 A.2d 308 (2004)).
On appeal, we concluded that the new rule should be given "pipeline" retroactivity, limited to pending cases where the parties have not yet exhausted all avenues of direct review:
The purpose of the evidence exception established by Guenther was to "promote fairness in the trial process" by enhancing "the truth-seeking function" of the jury. Such, a purpose would be furthered by retroactive application because any injustice caused by a strict application of N.J.R.E. 608 could then be corrected.
However, there was widespread and lengthy reliance upon the pertinent evidence rule. For many years, our courts have followed the general principle contained in N.J.R.E. 608 and the preceding version, Evidence Rule 22, which prevent the use of specific instances of conduct, such as prior false accusations, to challenge a witness's credibility.
Neither party has indicated the extent of disruption that would ensue from retroactive application of this decision, though we assume that any retroactive application of a new principle will cause some disruption. We are uncertain, however, how many prior cases involved "a victim-witness whose credibility was the central issue in the case" and who had made a false criminal accusation against another that was ruled inadmissible under the existing evidence rules. Given the nature of sexual abuse cases, we must also acknowledge that any previous proceedings that meet this limitation probably involve emotionally distraught victims who are not eager to *157 relive any prior painful experiences through additional testimony.
In weighing the three retroactivity factors, we conclude that the Guenther exception to N.J.R.E. 608 should be applied retroactively to this case, which was "in the pipeline" at the time Bray and Guenther were decided.
Here, when [the victim] was confronted by the prosecutor with defendant's charge that she had made a prior false accusation of sexual abuse, [the victim] denied ever having made such a statement to her family or, for that matter, reporting her co-workers. The court, without conducting any N.J.R.E. 104 hearing, announced that it would not allow defendant's mother "to testify about something that never occurred." Proper application of Guenther would require that a N.J.R.E. 104 hearing be conducted to determine whether the false statement was made and if so whether it would be admissible. Such a hearing must be conducted on the remand.
[R.E.B., supra, 385 N.J.Super. at 84-86, 895 A.2d 1224 (citations omitted).]
In limiting retroactivity to cases "in the pipeline," the R.E.B. court evidently did not find that the new rule, which, as here, affected the jury's assessment of the victim's credibility, was a "substantial" impairment of the truth-finding process. Otherwise, it would have accorded the new rule complete retroactive application "regardless of how much the State justifiably relied on the old rule or how much the administration of justice is burdened." Purnell, supra, 161 N.J. at 54, 735 A.2d 513.
We discern no distinction here. Although the new rule in P.H. is designed to enhance the reliability of the fact-finding process, we conclude that the old Bethune rule did not "substantially impair" the accuracy of that process. This is because it is unlikely that untrustworthy evidence was being admitted under the Bethune rule and that, in any event, a "defendant had alternate ways of contesting the integrity of the evidence being introduced against him." Purnell, supra, 161 N.J. at 55 n. 1, 735 A.2d 513. For example, a defendant was always free to cross-examine the victim and elicit any inconsistencies in his or her account. In addition to cross-examination, a defendant could produce other witnesses to contradict the victim's version and avail himself of other methods to attack the victim's credibility as permitted by our rules of evidence. Indeed, in this case, defense counsel argued strongly in her summation that A.F.'s silence was proof that the assault did not occur.[3]
Having found no "substantial" impairment, we next balance the extent to which *158 the Bethune rule may have impaired the reliability of the truth-finding process "against the countervailing State reliance on the old rule and the disruptive effect that retroactivity would have on the administration of justice." Burstein, supra, 85 N.J. at 408, 427 A.2d 525. The degree of reliance "is evaluated by assessing whether the old rule was administered in `good faith reliance [on] then-prevailing constitutional norms.'" Purnell, supra, 161 N.J. at 55, 735 A.2d 513 (citations omitted). In this regard, we assume uniform and widespread reliance on the Bethune mandate, which was actually incorporated in the Model Jury Charge.
As to the impact of retroactive application on the administration of justice, the Court in State v. Knight, 145 N.J. 233, 678 A.2d 642 (1996), explained:
The third factor in the retroactivity analysis, the effect a retroactive application would have on the administration of justice, recognizes that courts must not impose unjustified burdens on our criminal justice system. Thus, we generally have avoided applying new rules retroactively when such an application would undermine the validity of large numbers of convictions. We have noted our concern about overwhelming courts with retrials, and our awareness of the difficulty in re-prosecuting cases in which the offense took place years in the past. [Id. at 252, 678 A.2d 642 (citations omitted).]
Here, Bethune was controlling authority for fourteen years prior to the decision in P.H., and complete retroactivity of P.H. would presumably severely burden and disrupt the criminal justice system. Moreover, "[g]iven the nature of sexual abuse cases, . . . [relitigation would] involve emotionally distraught victims who are not eager to relive any prior Painful experiences through additional testimony." R.E.B. supra, 385 N.J.Super. at 85, 895 A.2d 1224. Thus, a proper balancing of all relevant considerations persuades us that P.H. should be given only pipeline retroactivity and not made applicable to cases, such as defendant's, on collateral review.
This same result follows under federal law. Indeed, "New Jersey's rules of retroactivity are more liberal than those applied by the federal courts." Cupe, supra, 289 N.J.Super. at 13, 672 A.2d 1233.
The United States Supreme Court in Schriro v. Summerlin, 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004), laid out the framework for federal retroactivity law, distinguishing cases pending on direct review from those on collateral review. "When a decision of this Court results in a `new rule,' that rule applies to all criminal cases still pending on direct review. As to convictions that are already final, however, the rule applies only in limited circumstances." Id. at 351, 124 S.Ct. at 2522, 159 L.Ed.2d at 448 (citations omitted).
Whether a new rule is to be applied retroactively to a case on collateral review depends on whether it is one of procedure or substance.

[S]ubstantive rules generally apply retroactively. This includes decisions that narrow the scope of a criminal statute by interpreting its terms, as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish. Such rules apply retroactively because they "necessarily carry a significant risk that a defendant stands convicted of `an act that the law does not make criminal" or faces a punishment that the law cannot impose upon him. [Id. at 351-52, 124 S. Ct. at 2522-23, 159 L.Ed.2d at 448.]
On the other hand, new procedural rules generally do not apply retroactively because "Whey do not produce a class of persons convicted of conduct the law does *159 not make criminal, but merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise." Id. at 352, 124 S.Ct. at 2523, 159 L.Ed.2d at 448-49. There are exceptions for "a small set of `watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." Ibid. (citations omitted). The Schriro Court explained "[t]hat a new procedural rule is `fundamental' in some abstract sense is not enough; the rule must be one `without which the likelihood of an accurate conviction is seriously diminished.'" Ibid. (citations omitted).
In other words, a new procedural rule applies retroactively in habeas proceedings if the new procedure is "(1) `implicit in the concept of ordered liberty,' implicating `fundamental fairness,' and (2) `central to an accurate determination of innocence or guilt,' such that its absence `creates an impermissibly large risk that the innocent will be convicted.'" Id. at 359, 124 S.Ct. at 2527, 159 L.Ed.2d at 453 (Breyer, J., dissenting) (citing Teague v. Lane, 489 U.S. 288, 311-13, 109 S.Ct. 1060, 1075-77, 103 L.Ed.2d 334, 356-58 (1989)).
To qualify as "watershed", a new rule must meet two requirements: "First, the rule must be necessary to prevent an "`impermissibly large risk'", of an inaccurate conviction. Second, the rule must `alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding.'" Whorton v. Bockting, ___ U.S. ___, ___, 127 S.Ct. 1173, 1182, 167 L.Ed.2d 1, 12 (2007) (citations omitted).
The "watershed" exception is extremely narrow: "We have observed that it is `"unlikely"' that any such rules `"ha[ve] yet to emerge,"' And in the years since Teague, we have rejected every claim that a new rule satisfied the requirements for watershed status." Whorton, supra, 127 S.Ct. at 1182, 167 L.Ed.2d at 12 (citations omitted). Indeed, the only rule that has ever fallen under this exception is the mandate that counsel must be appointed for an indigent defendant charged with a felony. Ibid. (citing Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)).
For reasons already expressed in our discussion of state retroactivity law, the rule announced in P.H. is not a watershed rule. It is not a rule without which the likelihood of an accurate conviction is seriously diminished, nor is it necessary to prevent an impermissibly large risk of an inaccurate conviction. Neither does it compare in significance or consequence with the rule applied retroactively in Gideon. And as noted, no other rule has since qualified. Indeed, the rule in P.H. does not compare in importance to other new rules the Supreme Court has declined to apply retroactively to cases on collateral review. See, e.g., Schriro, supra, 542 U.S. at 358, 124 S.Ct. at 2526-27, 159 L.Ed.2d at 452-53 (rule requiring a jury rather than a judge to decide if aggravating factors were present when considering whether to sentence a defendant to death); DeStefano v. Woods, 392 U.S. 631, 633-34, 88 S.Ct. 2093, 2095-96, 20 L.Ed.2d 1308, 1311-12 (1968) (rule which applied the Sixth Amendment's jury-trial guarantee to the States); Whorton, supra, 127 S.Ct. at 1177, 167 L.Ed.2d at 6 (the rule of Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), concerning testimonial hearsay statements of absent witnesses).
We are, therefore, satisfied that federal law requires no different result than state law. Moreover, the fact that neither compels complete retroactivity of the rule in P.H. leads us to conclude that defendant's final argument, that the fundamental constitutional issues implicated herein warrant complete retroactivity, is without merit. R. 2:11-3(e)(2). Suffice it *160 to say, simply because a trial court's jury instruction may be considered reversible error under present law does not automatically require the new rule be applied retroactively to cases already adjudicated on appeal well before the new rule was announced, and now on collateral review:
But it does not follow that, when a criminal defendant has had a full trial and one round of appeals in which the State faithfully applied the Constitution as we understood it at the time, he may nevertheless continue to litigate his claims indefinitely in hopes that we will one day have a change of heart.
[Schriro, supra, 542 U.S. at 358, 124 S.Ct. at 2526, 159 L.Ed.2d at 453 (citation omitted).]
Affirmed.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Specifically, the Court stated:

[t]o the extent that Bethune may be read to render victim silence or delay in reporting irrelevant to a jury's overall assessment of credibility, the case before us provides a vehicle for clarification. In performing its exceedingly important task of assessing credibility, the jury should be permitted to consider all relevant testimony. Viewed in the context of all the facts surrounding the claimed abuse, the timing of the report of abuse, or silence about it, can be relevant for the jury to consider in the totality of the circumstances. So long as the jury is instructed that such silence or delay, in and of itself, is not inconsistent with a claim of abuse, the proper balance is struck.
[P.H., supra, 178 N.J. at 397, 840 A.2d 808.]
[3] Defense counsel argued in summation:

And that, ladies and gentlemen, brings up an interesting point. Not only was [] very close to both these children. She raised them to some extent and had disciplinary power over them. Bought them things. They liked to go to her house,
[A.F.] never said anything to her. You heard that.
How about []? She would take out the kids. They would go out places. Do things for them. Shows, and movies and other things. She entertained them. You didn't hear anything from her?
. . . .
Wouldn't it be likely, I suggest to you that [A.F.] would make a comment if this were true to the two women he has a relationship with?
One he treats almost like a mother, [].
And his cousin, who is a little close in age. He is a bit younger. Who's taken him out, and if there was something going on, wouldn't he have said something with this opportunity?