NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2580-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

STEPHANIE HAND,

     Defendant-Appellant.

> **APPROVED FOR PUBLICATION**
> **November 8, 2024**
> **APPELLATE DIVISION**

Submitted October 17, 2024 – Decided November 8, 2024

Before Judges Rose, DeAlmeida and Puglisi.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 14-02-0007.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Mark Zavotsky, Designated Counsel, on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent (Deborah Bartolomey, Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

DeALMEIDA, J.A.D.

Defendant Stephanie Hand appeals from the March 27, 2023 Law Division order denying her petition for post-conviction relief (PCR) without an evidentiary hearing. At issue is whether the Supreme Court's holding in State v. Jackson, 243 N.J. 52 (2020), should be given full retroactive application. We conclude that the holding in Jackson does not apply to convictions, such as defendant's, for which direct appellate review was complete when the opinion in Jackson was issued. We therefore affirm the PCR court's order dismissing defendant's petition.

I.

In 2014, a grand jury indicted defendant and two co-defendants, Thomas D'Anna and Julio Concepcion, for their participation in a mortgage fraud scheme involving two fraudulent real estate sales transactions. The indictment charged the defendants with: (1) first-degree conspiracy to commit money laundering and/or theft by deception, N.J.S.A. 2C:5-2, N.J.S.A. 2C:21-25(b)(2)(a), and N.J.S.A. 2C:20-4(a) (count one); (2) first-degree money laundering, N.J.S.A. 2C:21-25(b)(2)(a) (count two); and (3) second-degree theft by deception, N.J.S.A. 2C:20-4(a) (count three).

The transactions concerned properties owned by D'Anna on which there were outstanding mortgages. The sales prices exceeded the mortgage balances. Defendant, then a licensed attorney, acted as the closing agent. She

lied on Department of Housing and Urban Development (HUD) closing statements by, among other things, falsely claiming to have received deposits from the purchasers and to have placed those deposits in her escrow account. In fact, the purchasers did not exist. Concepcion had obtained stolen identities and created fraudulent financial documents to obtain loans to straw purchasers to finance contracts to buy D'Anna's properties.

At the closings, a portion of the loan proceeds were used to satisfy the existing mortgages on D'Anna's properties. The remainder of the loan proceeds were distributed to D'Anna and Concepcion, who submitted fake invoices for renovations he falsely claimed to have performed at the properties. While defendant did not receive any of the loan proceeds, she was paid for acting as counsel at the closings. After making a few payments on the loans in the names of the straw purchasers, D'Anna and Concepcion abandoned the loans, allowing them to default, which ultimately resulted in foreclosures.

Defendant was tried separately. She denied having engaged in a conspiracy and testified she was hired to represent the purchasers in the two transactions unaware of the underlying scheme, stolen identities, fraudulent financial documents, or fraudulent renovation invoices. D'Anna entered a guilty plea to second-degree conspiracy. In exchange for the State's recommendation that he receive a probationary sentence, D'Anna agreed to

3

testify at defendant's trial. At trial, D'Anna denied knowing Concepcion had obtained stolen identities or created fraudulent financial documents. He admitted, however, he and defendant entered into an agreement to lie on the HUD statements in order to secure the two loans necessary to complete the closings.

Defense counsel sought to cross-examine D'Anna about the sentencing exposure he faced when he entered into his plea agreement. Specifically, he attempted to question D'Anna about the potential twenty-year maximum prison sentence he faced on the charges in the indictment, as well as a third fraudulent transaction for which he, but not defendant, was indicted. The court, however, limited cross-examination of D'Anna to the seven-year prison sentence recommended by the State in its first plea offer. The court noted D'Anna, as a first-time offender, was unlikely to receive the maximum sentence on all charges if convicted at trial. Thus, the court concluded, reference to a potential twenty-year maximum prison sentence would not reflect D'Anna's actual sentencing exposure and could mislead the jury.

In addition, the court expressed concern that questions about D'Anna's maximum sentencing exposure would inform the jury of defendant's maximum sentencing exposure because the two were charged with the same crimes. The court permitted defense counsel to explore all other aspects of D'Anna's plea

agreement, including that his counsel negotiated the State's initial offer from a seven-year prison term to a probationary sentence.

Concepcion also testified at trial. He admitted he was involved in the mortgage fraud and said D'Anna was a full-fledged co-conspirator from the formation of the scheme. Concepcion testified that he had never met defendant and did not conspire with her.

The jury convicted defendant of lesser-included offenses charged in each count of the indictment: second-degree conspiracy on count one; second-degree money laundering on count two; and second-degree theft by deception on count three. Defendant moved for a new trial, arguing, among other things, that the court's limitation on her cross-examination of D'Anna resulted in a miscarriage of justice. The trial court denied the motion and sentenced defendant to an aggregate four-year term of imprisonment.

On direct appeal, defendant argued, in part, that her Sixth Amendment rights were infringed when the trial court prohibited her counsel from questioning D'Anna about his full sentencing exposure prior to accepting the plea agreement. We rejected defendant's Sixth Amendment argument:

> The court balanced defendant's right to confront the witness on his expectation of favorable treatment from the State in return for his testimony with the State's right to be free from prejudicial and potential[ly] confusing evidence regarding the maximum exposure on the charges D'Anna originally faced. As the court

5

concluded, D'Anna did not realistically face a twenty-year sentence. The State initiated plea negotiations by offering him a recommended seven-year term. In addition, as a first-time offender [D'Anna] was unlikely to receive the maximum sentence on each of the counts were he to have been found guilty at trial. The limitation imposed by the court did not prevent defendant from using cross-examination for the desired purpose of questioning D'Anna's credibility by suggesting the State may have influenced his testimony through favorable resolution of his pending criminal charges.

[State v. Hand, No. A-0516-17 (App. Div. Aug. 14, 2019) (slip op. at 18).]

We reversed defendant's conviction of money laundering on other grounds, affirmed her remaining convictions, and remanded for resentencing. Id. at 19. On May 26, 2020, the trial court resentenced defendant.

On July 2, 2020, the Supreme Court issued its opinion in Jackson. In that case, the Court addressed "whether a defendant facing the same charges as a cooperating witness should be barred from exploring that adverse witness's sentencing exposure." 243 N.J. at 58. Defense counsel in Jackson sought to elicit testimony that the cooperating co-defendant would have been exposed to a sentencing range of three to five years when the State offered to recommend a prison term of three years in exchange for his cooperation and testimony against Jackson. Ibid. It was later determined that the cooperating co-

defendant was extended-term eligible due to prior convictions and faced up to ten years in prison had the prosecutor sought the extended term.  Id. at 70.

The court ultimately urged modification of the plea agreement, resulting in the State agreeing to recommend a probationary term conditioned on 180 days in jail.  Ibid.  The trial court precluded questioning regarding the co-defendant's maximum exposure because it believed the jury would infer that Jackson faced the same exposure and be more reluctant to convict him as a result.  Id. at 59, 62.  The trial court thus permitted testimony only about the length of the sentences recommended in the initial plea offer and the final agreement, not the maximum exposure.  Id. at 59.

Before the Supreme Court, Jackson argued the limitation on cross-examination of the cooperating co-defendant deprived him of his Sixth Amendment right to confrontation.  Ibid.  In considering this argument, the Court weighed defendant's confrontation right against the concern the jury would find the defendant not guilty if it inferred his sentencing exposure from the elicited testimony.  Id. at 69.  The Court held "the jury should have had full access to [the cooperating co-defendant's] plea agreement history through the defense counsel's unfettered examination of that history" and found the cross-examination limitations violated Jackson's rights to confrontation and a fair trial.  Id. at 59, 74.

A-2580-22

Instead of limiting the cross-examination, the Court explained, the trial court should have instructed the jury "not to speculate about or consider a defendant's potential sentence when deciding whether the State has proven the charges alleged beyond a reasonable doubt." Id. at 71. The Court did "not favor a process in which trial judges perform a generalized gatekeeping function and try to decide whether cross-examination would adequately convey enough information about a witness's credibility without allowing questions about the witness's sentencing range." Id. at 72.

The Court, however, noted "there is still a place for objections under N.J.R.E. 403[,]" ibid., which provides that "relevant evidence may be excluded if its probative value is substantially outweighed by the risk of . . . [u]ndue prejudice, confusion of issues, or misleading the jury . . . ." N.J.R.E. 403. For example, the Court noted a trial court "could properly curtail" cross-examination suggesting "a witness would receive consecutive sentences on multiple counts that would instead merge at sentencing . . . ." Ibid.

The Court went on to consider whether the error was harmless beyond a reasonable doubt. Id. at 72-74. The Court found that if the jury had known the co-defendant was actually facing an extended term of ten years but negotiated a probationary term in exchange for his testimony, it might have believed this key witness for the State was biased. Id. at 73-74. The Court emphasized the

defendant had a right to ask the co-defendant about his subjective understanding of his maximum sentencing exposure and thereby fully demonstrate the co-defendant's potential bias. Id. at 73. The Court could not conclude beyond a reasonable doubt that the limitation on the cross-examination was harmless. Id. at 74. Because the Confrontation Clause error denied Jackson a fair trial, his conviction was reversed, and the case was remanded for a new trial. Ibid.

On September 9, 2020, defendant moved for reconsideration of our opinion affirming in part and reversing in part her convictions. She argued the holding in Jackson applied retroactively and warranted reversal of her convictions in light of the limitations imposed on her cross-examination of D'Anna. We denied the motion, noting defendant could assert a claim for retroactive application of Jackson through a petition for PCR. State v. Hand, No. A-0516-17 (App. Div. Oct. 15, 2020).[1]

Defendant thereafter filed a PCR petition seeking retroactive application of the holding in Jackson. On March 27, 2023, the PCR court issued a written decision denying defendant's petition. The court accepted the parties'

_____

[1] The parties' briefs state defendant sought to cross-examine D'Anna with respect to a potential maximum sentence of fifty years. Our decision on direct appeal refers to a potential maximum sentence of twenty years. In either case, our analysis of the retroactive effect of Jackson is the same.

A-2580-22

agreement that <u>Jackson</u> announced a new rule with respect to the cross-examination of a cooperating co-defendant. In addition, the court concluded the new rule was designed to enhance the reliability of the truth-finding process.

The court found, however, the rule <u>Jackson</u> replaced did not substantially impair the accuracy of the truth-finding process because defendants had the opportunity to cross-examine cooperating co-defendants about the terms of their plea agreements, albeit in a more limited manner than is available under <u>Jackson</u>. As an example, the PCR court noted defendant's cross-examination of D'Anna under the old rule elicited detailed testimony about his plea agreement, including multiple mentions that his testimony was a key condition of the State's offer to reduce his sentence from a recommended seven years in prison to probation. Through this testimony, the court found, defendant was able to sufficiently explore D'Anna's possible bias and motivation to testify falsely.

The PCR court also found there was little likelihood of untrustworthy evidence admitted under the old rule because cross-examination under the old rule, while more limited than permitted under the new rule, did not elicit untrue information. In addition, the court found the State had long relied on the old rule, given the long-standing practice of permitting limitations on

10

cross-examination of cooperating co-defendants with respect to their sentencing exposure.

Finally, the court found complete retroactive application of Jackson would have a significant detrimental effect on the administration of justice. The record does not establish the number of convictions to which Jackson would apply if fully retroactive. However, the PCR court found the use of cooperating witnesses is common in multi-defendant cases, and longstanding, noting the issue was addressed by the Supreme Court as early as 1954 in State v. Spruill, 16 N.J. 73, 75-81. This factor, the court found, weighed against complete retroactivity.

After weighing these factors, the PCR court concluded complete retroactive application of Jackson was not warranted. In light of that conclusion, the court denied defendant's petition.[2] A March 27, 2023 order memorialized the PCR court's decision.

This appeal followed. Defendant argues:

---

[2] The PCR court also concluded that even if Jackson was retroactively applied to defendant's convictions she would not be entitled to relief. The court found the imposition of limitations on D'Anna's cross-examination was harmless error "considering the overwhelming evidence of the defendant's guilt." The court noted the State called several witnesses other than D'Anna and introduced documents establishing beyond a reasonable doubt that defendant served as the closing agent for the transactions and falsified the HUD closing statements.

THE PCR COURT ERRED WHEN IT DENIED DEFENDANT'S APPLICATION TO HAVE THE NEW RULE OF LAW ANNOUNCED IN STATE V. JACKSON, 243 N.J. 52 (2020)[,] APPLIED RETROACTIVELY TO THE CROSS-EXAMINATION OF THE STATE'S ONLY WITNESS TO TESTIFY AS TO CULPABILITY ON THE PART OF THE DEFENDANT.

II.

Under Rule 3:22-2(a), a defendant is entitled to PCR if there was a "[s]ubstantial denial in the conviction proceedings of defendant's rights under the Constitution of the United States or the Constitution or laws of the State of New Jersey . . . ." "A petitioner must establish the right to such relief by a preponderance of the credible evidence." State v. Preciose, 129 N.J. 451, 459 (1992). "To sustain that burden, specific facts" which "would provide the court with an adequate basis on which to rest its decision" must be articulated. State v. Mitchell, 126 N.J. 565, 579 (1992).

We review a judge's decision to deny a PCR petition without an evidentiary hearing for abuse of discretion. State v. Brewster, 429 N.J. Super. 387, 401 (App. Div. 2013) (citing State v. Marshall, 148 N.J. 89, 157-58 (1997)). We review the court's legal conclusion de novo. State v. Harris, 181 N.J. 391, 419 (2004).

Defendant argues she is entitled to PCR because her Sixth Amendment rights, as recognized in Jackson, were curtailed by the trial court's limitations

12

on her cross-examination of D'Anna. To benefit from the holding in <u>Jackson</u>, defendant must establish that the decision has retroactive effect.

To determine whether and to what extent a holding will be applied retroactively, we must first decide if it "announced" "a new rule of law." <u>State v. G.E.P.</u>, 243 N.J. 362, 382 (2020) (quoting <u>State v. Feal</u>, 194 N.J. 293, 307 (2008)). "A new rule exists if 'it breaks new ground or . . . if the result was not <u>dictated</u> by precedent existing at the time the defendant's conviction became final.'" <u>Feal</u>, 194 N.J. at 308 (quoting <u>State v. Lark</u>, 117 N.J. 331, 339 (1989) (internal quotations omitted)). "Obviously, where a new rule is not at issue, a retroactivity inquiry is unnecessary." <u>Ibid.</u>

The parties agree that <u>Jackson</u> created a new rule with respect to the scope of cross-examination of a cooperating co-defendant. We see no reason to disagree with the parties' position.

In light of the determination <u>Jackson</u> announced a new rule, "[t]here are four options: (1) prospective application, (2) application 'in future cases and in the case in which the rule is announced,' (3) '"pipeline retroactivity," rendering it applicable in all future cases, the case in which the rule was announced, and any cases still on direct appeal,' or (4) 'complete retroactive effect.'" <u>G.E.P.</u>, 243 N.J. at 386 (quoting <u>State v. Knight</u>, 145 N.J. 233, 249 (1996) (internal quotations omitted)).

Because defendant's direct appeal of her convictions was completed prior to the issuance of Jackson, she is entitled to relief only if complete retroactivity applies to its holding. Three questions influence our determination of the extent to which Jackson will apply retroactively: "(1) the purpose of the rule and whether it would be furthered by a retroactive application, (2) the degree of reliance placed on the old rule by those who administered it, and (3) the effect a retroactive application would have on the administration of justice." State v. Henderson, 208 N.J. 208, 300 (2011) (quoting Knight, 145 N.J. at 251). "We do not accord those factors 'equal weight.'" G.E.P., 243 N.J. at 386 (quoting Henderson, 208 N.J. at 301). "The first factor, the purpose of the new rule, is often the pivotal consideration." State v. Burstein, 85 N.J. 394, 406 (1981).

A new rule's purpose falls into one of three categories. "First, 'a new rule may be intended solely to deter police misconduct. In such a case, retroactivity would almost certainly be denied because the new rule's deterrent purpose would not be advanced by retroactive application to past misconduct.'" State v. J.A., 398 N.J. Super. 511, 520 (App. Div. 2008) (quoting State v. Purnell, 161 N.J. 44, 54 (1999)). Second, "where the purpose of the new rule 'is to overcome an aspect of the criminal trial that substantially impairs its truth-finding function' and which raises 'serious questions about the accuracy

of guilty verdicts in past trials'" the first factor points to a complete retroactive application.  Burstein, 85 N.J. at 406-07 (quoting Williams v. United States, 401 U.S. 646, 653 (1971)).  "In between these extremes is a third category of cases, where the new rule is designed to enhance the reliability of the factfinding process but the old rule did not 'substantially' impair the accuracy of that process."  Id. at 408.

To determine the extent to which the old rule impaired the truth-finding process, we consider "first, the likelihood of untrustworthy evidence being admitted under the old rule and, second, whether the defendant had alternate ways of contesting the integrity of the evidence being introduced against" them.  Ibid.  Second, we balance "the extent to which the old rule impaired the reliability of the truth-finding process" against the "countervailing State reliance on the old rule and the disruptive effect that retroactivity would have on the administration of justice."  Ibid.

Clearly, the first category is not implicated here.  The scope of permissible cross-examination of a cooperating co-defendant is unrelated to police conduct.  The holding in Jackson addresses the truth-finding process at trial, given that it is intended to provide jurors with a broader range of information on which they may make a credibility determination with respect to a cooperating co-defendant.

We agree with the State's argument that the rule replaced by <u>Jackson</u> did not substantially impair the truth-finding process at trial. Prior to <u>Jackson</u>, defendants were permitted to question cooperating co-defendants about plea bargain negotiations, although in a more limited fashion than required by <u>Jackson</u>. For example, defendant's lengthy cross-examination of D'Anna revealed that he faced a significant prison sentence which he would likely avoid by testifying against defendant. The jurors heard the State's original recommendation was for a seven-year prison sentence and D'Anna's counsel negotiated an agreement for a recommendation of probation in exchange for D'Anna's cooperation.

In addition, defendant called Concepcion as a witness. He cast doubt on D'Anna's credibility, testifying that D'Anna was a conspirator in the mortgage fraud from its inception, contrary to D'Anna's testimony. Defendant, therefore, used alternate ways of contesting the integrity of the evidence being introduced against her through D'Anna's testimony.

We also agree that under the old rule the admission of untrustworthy evidence was not likely. <u>Jackson</u> enhances the truth-finding process by providing jurors with additional evidence on which to make credibility determinations. It does not address a prior practice under which untrustworthy evidence was likely to be admitted. The testimony permitted under the old

16

rule would also be admissible under <u>Jackson</u>. The difference under the new rule is that additional testimony introduced during cross-examination will assist the triers of fact in determining the cooperating witness's credibility. We agree, therefore, that the purpose of the new rule militates against complete retroactivity.

We reach the same conclusion with respect to the State's reliance on the old rule, which was longstanding, and the impact on the administration of justice that would result from complete retroactivity. As the PCR court recognized, co-defendant cooperation has long been a facet of multi-defendant trials. It is likely that complete retroactive application would potentially disrupt numerous convictions.

The Court faced similar circumstances in <u>State v. Bellamy</u>, 178 N.J. 127 (2003). In that case, the Court considered whether to retroactively apply its holding that a defendant must be informed of the possibility of civil commitment under the New Jersey Sexually Violent Predator Act (the Act), N.J.S.A. 30:4-27.24 to -27.38, when entering a guilty plea to certain predicate offenses. <u>Id.</u> at 131. When undertaking its analysis, the Court noted that trial courts routinely did not inform defendants of the possibility of civil commitment before accepting their pleas, but the number of pleas entered under such circumstances had not been established by the parties. <u>Id.</u> at 142.

17

The Court held that "[w]hile we do not know the exact number of defendants who pled guilty to a predicate offense without knowing the possible consequences under the Act . . . , we recognize that full retroactivity of this decision would have a disruptive effect on the administration of justice."  Ibid.  The Court continued,

> [t]he lack of data regarding the number and kinds of cases that would be affected by a rule of complete retroactivity and the impact that complete retroactivity would have on the administration of justice mandates that the new rule should apply only to cases pending direct review at the time of the rule's announcement.
>
> [Id. at 142-43.]

The Court's reasoning is equally applicable here.

We also are not persuaded by defendant's argument that the holding in Jackson is similar to the holdings in State v. Afanador, 151 N.J. 41, 59 (1997), and Roberts v. Russell, 392 U.S. 293, 293 (1968), where complete retroactivity was applied.

Afanador addressed whether the holding in State v. Alexander, 136 N.J. 563 (1994), should apply with complete retroactivity.  In Alexander, the Court held that before a "defendant could be convicted as drug kingpin under N.J.S.A. 2C:35-3, the jury should be instructed that it must find the defendant held an 'upper echelon' or 'high level' role as leader of a drug trafficking network."  Afanador, 151 N.J. at 46.  The Court held that Alexander did not

18

announce a new rule. Id. at 57. Instead, the Court concluded that Alexander clarified ambiguities in a statute and did not bring about "a 'sudden and generally unanticipated repudiation of a long-standing practice.'" Id. at 57-58 (quoting State v. Cupe, 289 N.J. Super. 1, 12 (App. Div. 1996)). Thus, a retroactivity analysis was not necessary. This is a critical distinction, given that the parties and this court agree Jackson announced a new rule.

In dicta, the Court held that if Alexander were considered to have announced a new rule, complete retroactivity would apply to its holding. Id. at 59. However, in reaching that conclusion, the Court noted "[t]here was no definitive case law regarding the jury instruction prior to Alexander. Thus, past reliance is not a strong argument for precluding retroactive application." Ibid. In addition, the Court found that "[t]he third factor, the administration of justice, does not appear sufficient to outweigh the first factor" militating in favor of complete retroactivity. Ibid. The Court noted that of the twenty-nine drug kingpin convictions obtained as of that time, eighteen were the result of guilty pleas. Ibid. "Those pleas may have established unequivocal status as a drug kingpin. Relief from such pleas would not be warranted" under Alexander. Ibid. While we do not have evidence of the number of convictions that would be called into question by a complete retroactive application of

Jackson, the PCR court took notice of the common practice of co-defendant cooperation in multi-defendant cases.

Roberts concerned the retroactivity of Bruton v. United States, 391 U.S. 123 (1968). As the Court explained in Roberts, the Bruton Court held that admission at a joint trial of a co-defendant's extrajudicial confession implicating the defendant violated the defendant's Sixth Amendment confrontation rights. 392 U.S. 293-95. The Court noted that it had "retroactively applied rules of criminal procedure fashioned to correct serious flaws in the fact-finding process at trial." Id. at 294 (quoting Stovall v. Denno, 388 U.S. 293, 298 (1970)). The Court found the rule abrogated by Bruton was "a constitutional error [that] present[ed] a serious risk that the issue of guilt or innocence may not have been reliably determined." Id. at 295. We do not view Jackson as having corrected a constitutional error of the magnitude addressed in Bruton.

The new rule announced in Jackson is more similar to new rules concerning a defendant's opportunity to challenge the credibility of the State's evidence previously found not to be completely retroactive. See Feal, 194 N.J. at 307-12 (applying pipeline retroactivity to new rule prohibiting prosecutors from drawing the jury's attention to defendant's presence at trial and concomitant opportunity to tailor their testimony); J.A., 398 N.J. Super. at

20

522-25 (applying pipeline retroactivity to new rule permitting jury to consider passage of time between alleged sexual assault on a child and child's reporting of said assault); State v. R.E.B., 385 N.J. Super. 72, 84-86 (App. Div. 2006) (applying pipeline retroactivity to new rule allowing defendant to cross-examine victim of sexual abuse about prior false accusation).

We therefore conclude that complete retroactive application of Jackson is not warranted. Because defendant's direct appeal was completed at the time Jackson was issued, the PCR court correctly determined she was not entitled to relief under Jackson and dismissed her complaint. Given that defendant would only benefit from complete retroactive application of Jackson, we need not decide if pipeline retroactivity applies to the holding in Jackson.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2580-22